PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-2082

_____

THE ESTATE OF JOHN L. OLIVA, JR.,
by his Administratrix CTA, Kelli Ann McHugh,
                                          Appellant

v.

STATE OF NJ, DEPARTMENT OF LAW AND PUBLIC
SAFETY, DIVISION OF STATE POLICE; JOHN J.
FARMER, JR., in his official capacity; CARSON DUNBAR,
in his official capacity; BRUCE MYERS; ALBERT
WALDRON; RAY LUPU; JAMES HARRIS; GEORGE
GILMAN; GARY AUSTIN; HORACE MACFARLAND;
REGINALD WILLIAMS; FRANCES DONLAN; WILLIAM
MEDDIS; KENNETH SCHAIRER; JOHN ZULAWSKI;
EDWARD SOKORAI; GLENN MILLER; JOHN
HAGGERTY; ROBIN BLAKER; JOHN DOES, 1-5;
ROBERT KILMURRARY; DONALD IZZI, all individually;
JOSEPH SANTIAGO; GAIL CAMERON; DEBRA
ARMITAGE

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 1:01-CV-02259)

Honorable Joseph E. Irenas, District Judge

Argued March 9, 2010

BEFORE: MCKEE, BARRY, and
GREENBERG, Circuit Judges

(Filed: May 4, 2010)

William H. Buckman (argued)
Surinder K. Aggarwal
Lilia Londar
William H. Buckman Law Firm
110 Marter Avenue
Suite 209
Moorestown, NJ 08057

Joseph M. Pinto
Polino and Pinto
720 East Main Street
Suite 1C
Moorestown, NJ 08057
    *Attorneys for Appellant*

Catherine Tamasik (argued)
Jason D. Attwood
DeCotiis, Fitzpatrick, Cole & Wisler
500 Frank W. Burr Boulevard

Glenpointe Centre West, Suite 31
Teaneck, NJ 07666
   *Attorneys for Appellees*

---

OPINION OF THE COURT

---

GREENBERG, <u>Circuit</u> <u>Judge</u>

## I.  INTRODUCTION

This matter comes on before this Court on an appeal from an order of the District Court entered on September 30, 2008,[1] granting Appellees' motion for summary judgment and denying the request of Appellant, John Oliva, for leave to amend further his already twice amended complaint.  <u>See</u> <u>Estate of Oliva v. New Jersey</u>, 579 F. Supp. 2d 643 (D.N.J. 2008).  Though the Court denied summary judgment to a remaining defendant, when Oliva subsequently dismissed the case against that defendant the order of September 30, 2008, became final and thus we have jurisdiction over his appeal. For the reasons that follow, we will affirm the order of the District Court.

---

[1]The notice of appeal incorrectly states that the District Court entered its order on September 30, 2009.

## II. BACKGROUND

The Division of State Police in the New Jersey Department of Law and Public Safety employed Oliva as a state trooper from November 1998 until his suicide on October 1, 2002. Oliva's complaint in this action alleged that during this four-year period, both while he was on active duty and while he was on leave, numerous individuals connected with the State Police harassed him in reaction to his objections to what he believed was a State Police practice to profile motorists when making traffic stops, i.e., "the practice of using stereotypes to select which motorists a trooper will stop, detain and search." Supp. App. at 16. Oliva's complaint alleged that the harassment involved a variety of actions including unjustified transfers of his duty station, unjustified negative performance notices, misconduct investigations, adverse medical recommendations, threatening notes, and verbal confrontations.

Though Oliva personally filed the original complaint in this case in the District Court, since the time of his death his estate has prosecuted the action. Nevertheless, as a matter of convenience we have referred and will continue to refer to Oliva as though he has been the sole plaintiff. Though we set forth the facts at some length, the District Court in its September 30, 2008 opinion accompanying the order from which Oliva appealed, set forth the facts in greater detail. The facts as we describe them either are undisputed or, if disputed, are recited in the way most favorable to Oliva as the non-movant on the summary judgment motion.

A.    Oliva's Tenure as an Active-Duty State Trooper

Oliva joined the New Jersey State Police following a successful ten-year career as a Marine, corrections officer, and municipal police officer.  Upon Oliva's graduation from the State Police Academy in November 1998, the State Police assigned him to the Bellmawr Station, Troop A.  Consistently with the practice of assigning new recruits with a "Trooper Coach," the State Police paired Oliva at Bellmawr with a trooper named Patrick Gallagher.  Oliva alleges that Gallagher required him to engage in racial profiling of motorists when making traffic stops.  Oliva complained about Gallagher to his sergeant, Manny Gordillo, but did not state specifically that Gallagher was instructing him to profile because Oliva thought this already "was known to everybody at the station."  App. at 405.  Oliva believed that his complaint to Gordillo gained him a reputation at Bellmawr as a "salty" recruit, i.e., someone who didn't play by the rules or have respect for senior officers, and charged that after he made the complaint other troopers literally began placing salt in his station mailbox.

The State Police transferred Oliva to the Woodbine Station, Troop A, in May 1999, and placed him under the supervision of Appellee Edward Sokorai.  On August 22 and November 27, 1999, Sokorai issued Oliva negative performance notices reflecting Sokorai's assessment of Oliva's performance of his traffic enforcement duties.  Shortly after receiving the second such notice, Oliva arrived for a shift at Woodbine where Appellee Bruce Myers met him and handed him an anonymous note that read:

5

HEY OLIVA, EVERYONE AROUND HERE IS GETTING SICK AND TIRED OF YOUR SHIT. WHETHER YOU LIKE IT OR NOT, YOU'RE STILL A RECRUIT. IF YOU DON'T LIKE IT YOU CAN GO BACK TO YOUR OLD DEPARTMENT WHERE YOU CAME FROM. YOU BETTER START DOING WHAT YOU'RE TOLD TO DO. WE'RE ALL WATCHING YOU OLIVA.

App. at 624. Oliva contends that another trooper who no longer is a party to this action acknowledged writing the note.

In early 2000, the State Police transferred Oliva from the Woodbine Station to another Troop A station at Buena Vista. Appellee Glenn Miller, the Commander of Troop A, was responsible for the transfer decision. Oliva's transfers from Bellmawr to Woodbine and from Woodbine to Buena Vista were consistent with State Police practice at the time to assign a newly appointed trooper to his or her first two duty stations for approximately six months at each station and then to reassign the new trooper to a third station for an indefinite period determined by administrative needs and the trooper's preference.[2]

Oliva claims that his supervisor at Buena Vista, Albert Waldron, taught him about racial profiling and expected him

---

[2]Though we indicate that the initial transfers were in accordance with policy at the time, we are not implying that the State Police has changed the policy as we do not know the current policy.

6

to engage in that practice.[3] Oliva asserts that when he objected to racial profiling, Waldron threatened to give him a negative performance evaluation.[4] According to Oliva, in April 2000 Waldron accused Oliva of not making enough arrests, an accusation that led Oliva to respond that "I am not gonna go sit . . . and profile." App. at 449. Approximately one week later, Waldron issued Oliva a negative performance evaluation, which Oliva challenged by writing a letter addressed to SFC P. Callen, Waldron's superior in the State Police chain-of-command, raising concerns about profiling and arguing that Waldron's evaluation was unjustified. After speaking with Oliva, Callen ordered Waldron to write a new evaluation giving Oliva the highest possible marks in all applicable criteria.

The State Police retransferred Oliva to the Woodbine Station in August 2000. According to Commander Miller, the State Police made this transfer as an aspect of a personnel

---

[3]Oliva asserted claims under 42 U.S.C. § 1981 and the New Jersey Conscientious Employee Protection Act against Waldron that were his only claims that survived the District Court's September 30, 2008 summary judgment decision and order. Subsequently, Oliva withdrew those claims voluntarily, and Waldron is not a party to this appeal.

[4]In the New Jersey State Police, there is a distinction between a performance "notice," which relates to a trooper's conduct in a discrete incident, and a performance "evaluation" such as the one that Waldron gave, which evaluates a trooper's performance over an extended period.

rearrangement to fill a vacant position as well as to reduce the commute times of several troopers. The transfer did not significantly affect Oliva's commute time as his residence was approximately equidistant from the Buena Vista and Woodbine Stations. Miller claims to have been unaware of Oliva's previous problems at Woodbine when he approved the transfer.

Approximately one month after Oliva returned to Woodbine, a fellow trooper approached him and accused him of anonymously posting offensive messages on an unofficial State Police website called "Troop Rumblings." Oliva responded by denying responsibility for the postings. Appellees troopers Gary Austin and Horace McFarland subsequently questioned Oliva about these postings for over an hour in a closed door meeting. Thereafter, Appellee Ray Lupu, Oliva's supervisor, met with Oliva and told him that, as a result of the internet postings, station personnel would shun him, his locker "would be in the parking lot by now" if the Lords of Discipline acted as they had in the past, and Commander Miller was "pissed" at him and would seek his transfer. App. at 572. The reference to the Lords of Discipline was to a sub rosa organization within the State Police which, allegedly, at the time harassed and retaliated against troopers who failed to conform with what the troopers involved with the Lords of Discipline believed were the established practices and culture of the State Police.

On October 9, 2000, Oliva reported to work to find his locker vandalized and copies of an anonymous note placed in the locker and taped to a nearby toilet seat. The note read:

8

> HEY 'THERE BIG FUCKIN DADDY' TAKE
> YOUR SALTY FUCKIN ATTITUDE BACK
> TO THE LOCAL DEPTS. WE'RE ALL
> WATCHING YOU OLIVA. FILL OUT A
> TRANSFER REQUEST, IT'S TIME YOU
> MOVED ON

App. at 625. The following day, Lupu issued Oliva a negative performance notice for failing to report properly at the Woodbine Station that he had attended a municipal court proceeding on his off-duty time.

Several days later, Oliva received another negative performance notice for "fail[ing] to get the appropriate rest before arriving for work." App. at 634. This notice was the result of an accusation by Appellee trooper James Harris that Oliva had been sleeping on the job during a midnight shift at the Woodbine Station, a charge that Oliva denied. Subsequently, Oliva received a third anonymous note, which read:

> Boy ....... I [t]hink I'll come in and 'work' an overtime, and go to sleep in the back room cause I'm all caught up. Move on there tough guy, you still have Bridgeton, Port [Norris] and Woodstown.[5]

---

[5]Bridgeton, Port Norris, and Woodstown are stations within Troop A.

App. at 626. The record does not disclose who was responsible for the two anonymous notes Oliva received during his second stint at the Woodbine Station. Shortly after receiving the last note, Oliva took sick leave for a back injury he sustained while off-duty.

### B. The Internal Investigations

While on leave, Oliva spoke with State Police senior officers about the difficulties he had been experiencing at work. On December 27, 2000, Appellees William Meddis and Robin Blaker of the State Police's Quality Control and Adjudication Bureau interviewed Oliva regarding his allegations of harassment.[6] Oliva described the alleged harassment he experienced at the Woodbine and Buena Vista stations, but at no point raised the issue of racial profiling or discussed any event at the Bellmawr Station. When Oliva mentioned that he was storing one of the anonymous notes in a safe-deposit box, Meddis ordered him to relinquish the note for analysis and fingerprint testing.

---

[6]The State Police's Internal Affairs unit is called the Office of Professional Standards and is divided into the Quality Control and Adjudication Bureau and the Internal Affairs Investigation Bureau. The Quality Control and Adjudication Bureau processes all incoming misconduct complaints and decides which complaints merit further investigation, and the Internal Affairs Investigation Bureau investigates misconduct complaints.

Following the December 2000 interview, Meddis recommended that the State Police transfer Oliva from the Woodbine Station in order to prevent further harassment. Despite an offer apparently made to Oliva to transfer him outside of Troop A to the Bass River Station in Troop B, Appellee Carson Dunbar, then the State Police Superintendent, ordered Oliva transferred to the Tuckerton Station, which was near the Bass River Station but nevertheless within Troop A. According to Dunbar, he "did not want to start a precedent that if somebody chooses, they can just basically decide they're going to go to this station or that station." App. at 694. The State Police transferred Oliva to the Tuckerton Station on January 4, 2001, but he never reported for active duty at that station as he instead took stress leave from the State Police.

Following Oliva's interview with Meddis and Blaker, the Internal Affairs Investigation Bureau ("IAIB") launched an investigation led by Appellees Kenneth Schairer and John Zulawski into Oliva's allegations. After unsuccessfully attempting to contact Oliva for several days to pick up the anonymous note in his possession, on January 5, 2001, Schairer and Zulawski located Oliva at his gym where they followed him into the sauna and questioned him about the note. Oliva denied knowing the location of the note, but subsequently his attorney with his knowledge gave the note to the IAIB.

On January 4, 2001, one day prior to the meeting at the gym, Oliva requested permission from the State Police to speak to the media "[b]ecause of the refusal of the State Police to deal with the harassment [he] was receiving and

upon recommendation of counsel." App. at 574-75. On January 23, 2001, the <u>Philadelphia</u> <u>Inquirer</u>, a newspaper widely circulated in southern New Jersey where the stations we have mentioned are located, published an article entitled "N.J. trooper: Even now, fighting profiling costs him." App. at 736-38. The article covered the topics Oliva had discussed with Meddis and Blaker in the December 2000 meeting, and also described Oliva's encounter with Schairer and Zulawski on January 5, 2001. Moreover, it described in detail Oliva's complaints about being instructed to engage in racial profiling of motorists while at the Bellmawr and Buena Vista Stations. Additionally, the article discussed allegations that other troopers made regarding the activities of the Lords of Discipline.

After the article's publication, the State Police expanded the IAIB investigation of Oliva's allegations into a more general inquiry of the Lords of Discipline. Superintendent Dunbar asked Appellee Gail Cameron[7] to lead the investigation because she previously had investigated the Lords of Discipline in connection with another trooper's complaint. The State Police also brought Appellee Debra Armitage into the investigation at this time.

On May 11, 2001, Oliva filed his initial complaint under both federal and New Jersey law in this action in the District Court alleging, <u>inter</u> <u>alia</u>, that he had been harassed in

---

[7]The District Court spelled Cameron's first name as "Gayle." We are using "Gail" to be consistent with the caption of this case.

12

retaliation for refusing to engage in racial profiling.[8]  At about the same time Oliva filed a parallel complaint with the Department of Law and Public Safety's Equal Employment Opportunity Affirmative Action Office.  That office, however, advised Oliva that it would not pursue the complaint and, instead, forwarded Oliva's complaint to the IAIB for its consideration in the ongoing internal investigation.

Because Oliva had not discussed his racial profiling allegations with the IAIB,  Cameron and Armitage scheduled an interview with Oliva on December 10, 2001, to deal with that subject.  At the interview, Oliva described how Gallagher and Waldron had instructed him to stop, detain, and search motorists without probable cause, and stated that he had complained about such instructions.  Oliva denied actively participating in searches that he thought were illegal, but admitted to falsifying police reports at the Bellmawr Station pursuant to Gallagher's directions.

On May 21, 2002, Appellee Joseph J. Santiago, who by then had become the State Police Superintendent, sent a letter to Oliva that read in its entirety:

> Pursuant to the agreement between the State of New Jersey and the State Troopers Fraternal Association, I am hereby putting you on notice that I am contemplating not reappointing you to

---

[8]We describe Oliva's claims as set forth in the complaint as amended later in more detail below.

13

the Division of State Police upon the expiration of your present enlistment.

App. at 750. According to Santiago, he wrote the letter in furtherance of a State Police effort to require as many employees on leave as possible either to return to duty or be removed from employment so that the State Police could appoint replacements for them.

Following the December 2001 interview, Armitage received approval to launch a separate investigation into Oliva's allegations of racial profiling in which Gallagher was the principal, a status that treated him as the target of the inquiry. Armitage then identified a random sampling of ten motorists that Gallagher and Oliva had stopped while they had worked together at Bellmawr, and Armitage was able to contact and interview four of these motorists. These motorists gave accounts of their traffic stops suggesting that Oliva was at least as culpable as Gallagher in conducting illegal stops, searches, and seizures. Two of the these motorists submitted to polygraph examinations with respect to their statements regarding the stops and on July 5, 2002, Armitage received results from the examinations indicating that their accounts had been truthful.

On July 17, 2002, Armitage recommended that the State Police change Oliva's status in the investigation from complainant to principal. On August 12, 2002, a letter was delivered to Oliva informing him of the change in his status in the investigation and requesting that he consent to an interview as a principal. Oliva contacted Armitage on August 16, 2002, indicating he would schedule that interview after

14

consultation with his attorney. When Armitage did not hear back from Oliva for two weeks, she ordered that the investigation be considered complete at that point. Nevertheless, the investigation continued because Oliva subsequently contacted Armitage who interviewed him on September 17, 2002. When confronted with the motorists' statements, Oliva admitted that, despite his previous denials, he had conducted post-arrest searches that he considered illegal.

In an August 30, 2002 document titled "Internal Investigation Allegations & Conclusions," Armitage substantiated in part the allegations against Oliva and Gallagher. Supp. App. at 295-301. In particular, Armitage substantiated the allegations that Oliva purposely had provided false information in his December 10, 2001 interview by stating he never engaged in any illegal motor vehicle searches with Gallagher, and that both Oliva and Gallagher had falsified investigation reports. After being informed of Armitage's conclusions, Superintendent Santiago suggested that, in exchange for testifying against Gallagher, the State Police offer Oliva the opportunity to resign instead of being terminated. There is no indication in the record of which we are aware that anyone in the State Police communicated either the results of the investigation or Santiago's proposal to Oliva before his suicide on October 1, 2002.[9]

_____

[9]Even if Oliva became aware of the results of the investigation and/or Santiago's proposal our result on this appeal would not be changed.

15

C.      Oliva's Medical History

After Oliva took stress leave in January 2001, Appellee Dr. Donald Izzi,[10] the Managing Physician of the State Police's Medical Services Unit, directed him to undergo physical and psychological evaluations at the Environmental and Occupational Health Science Institute ("EOSHI"), an independent medical center, to determine his fitness for duty. After seeing Oliva, EOSHI transmitted a written evaluation to the Medical Services Unit stating that he was fit for duty. Thereafter, Izzi met with Oliva, provided him with a copy of EOSHI's report, and recommended that he return to full duty status and report for duty at the Tuckerton Station on the morning of August 13, 2001.

Oliva subsequently met with State Police contract physician Dr. Robert Carty for a duty status examination, but failed to disclose Izzi's recommendation to Carty. Based on a belief that Oliva was using alcohol to excess, Carty recommended that Oliva remain on sick leave. After becoming aware of Carty's conclusions regarding Oliva's alcohol use and receiving additional information from Oliva's private doctors who indicated that Oliva should not return to duty, Izzi sent a letter to Oliva on September 28, 2001, continuing Oliva in a "temporary off duty capacity" to allow him time to complete his medical recuperation. App. at 1035.

_____

[10]Though Oliva's initial complaint did not name Izzi, Oliva added Izzi as a defendant in his first amended complaint that he filed on September 5, 2001.

16

## III.  PROCEDURAL HISTORY

Oliva amended his complaint twice and thus we are concerned with his second amended complaint filed in the District Court on February 3, 2003.  This second amended complaint asserted 16 claims under federal civil rights law and New Jersey law against the State of New Jersey and over 20 individual defendants in their individual or official capacities most of whom we have identified in setting forth the background of the case.  After earlier proceedings resulted in the dismissal of some of his claims and after extensive discovery, Appellees moved for summary judgment on January 15, 2008, on Oliva's remaining claims under 42 U.S.C. §§ 1981, 1983, 1985(3), and 1986, the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1 et seq. (West 2000), and the New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann. § 10:5-1 et seq. (West 2002).  In response to the summary judgment motion, Oliva sought to amend his complaint a third time to include a First Amendment retaliation claim under 42 U.S.C. § 1983.  In a comprehensive opinion and order dated September 30, 2008, the District Court granted Appellees' motion for summary judgment on all of Oliva's remaining claims against Appellees, and denied Oliva leave to amend his complaint to include the First Amendment claim.  Estate of Oliva, 579 F. Supp. 2d 643.  This appeal followed.


## IV.  JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction over Oliva's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Oliva's New Jersey state law claims pursuant to 28 U.S.C. § 1367. We have jurisdiction over the order for summary judgment pursuant to 28 U.S.C. § 1291. We exercise plenary review over a grant of summary judgment and apply the same standard the District Court used. Smith v. Johnson & Johnson, 593 F.3d 280, 284 (3d Cir. 2010). Thus, we can affirm only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [Appellees as] the movant[s are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). We review the District Court's order denying Oliva leave to amend his complaint for an abuse of discretion. In re Merck & Co. Secs, Derivative & ERISA Litig., 493 F.3d 393, 399 (3d Cir. 2007).

## V. DISCUSSION

On appeal, Oliva challenges only the aspects of the District Court's decision granting summary judgment against him on his claims under 42 U.S.C. §§ 1981 and 1985(3), the CEPA, and the LAD, and denying leave to amend his complaint to include a claim for First Amendment retaliation under 42 U.S.C. § 1983. We consider each issue in turn.

A. Oliva's Claims under section 1981

18

Oliva first argues that the District Court erred by dismissing his claim under 42 U.S.C. § 1981, asserting "that Appellees retaliated against Oliva [by] harassing him and creating a hostile work environment due to his complaints of racial profiling."[11]  Appellant's br. at 34.  Section 1981(a) provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Ordinarily, to establish a basis for relief under section 1981 a plaintiff must show "(1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of

---

[11]The District Court indicated that it was not clear whether Oliva had brought a hostile work environment claim that was independent of his retaliation claim.  The Court stated, however, that "[e]ven if such a claim were asserted, it would fail as [Oliva] does not allege that [he] was discriminated against on the basis of his own race."  Estate of Oliva, 579 F. Supp. 2d at 664 n.55 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63, 126 S.Ct. 2405, 2412 (2006)).

19

the activities enumerated in § 1981." See Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002) (internal citation and quotation marks omitted). The Supreme Court, however, has held that section 1981 also encompasses "the claim of an individual (black or white) who suffers retaliation because he has tried to help a different individual, suffering direct racial discrimination, secure his § 1981 rights." See CBOCS West, Inc. v. Humphries, 553 U.S. 442, —, 128 S.Ct. 1951, 1958 (2008). In a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation. Id.

The record before us would justify a reasonable factfinder to conclude that Gallagher and Waldron demonstrated to Oliva how to stop, search, and, in some cases, arrest motorists without probable cause by reason of their race.[12] Of course, that practice would violate section 1981's guarantee that all persons are entitled to the same "full and equal benefit" of the law. See 42 U.S.C. § 1981(a). When a trooper complains about unjustified racial profiling he engages in protected activity and, accordingly, Oliva had a right to complain about such violations without fear of retaliation.[13]

---

[12]In fairness to Gallagher and Waldron it should be understood that we are not making any such finding.

[13]Though we are treating the alleged racial profiling in this case as being unlawful, we are not holding that there never can be a situation in which there could be lawful profiling on some basis as that issue is not before us and thus we do not reach it.

20

To maintain a claim for retaliation, Oliva first was required to establish that he had a prima facie case by tendering evidence that (1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).[14] In considering the second element of a prima facie case, the key inquiry is whether the alleged retaliation "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." See id. at 341 (quoting Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006)). The third element of the prima facie case "identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus." Id. at 342 (internal citation omitted). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to advance a legitimate non-retaliatory reason for its conduct. If an employer advances such a reason, a plaintiff then must show that the proffered reason was a pretext for retaliation. Id.

Oliva alleges he engaged in protected conduct in November 1998, when he complained to Gordillo about Gallagher's behavior during the Trooper Coach program; in April 2000, when he objected to Waldron about profiling; in

---

[14]Although Moore is a Title VII retaliation case, the same standard applies in section 1981 retaliation cases. Humphries v. CBOCS West, Inc., 474 F.3d 387, 403-04 (7th Cir. 2007), aff'd, 553 U.S. 442, 128 S.Ct. 1951 (2008).

May 2000, when he complained to Callen about Waldron's profiling; on January 23, 2001, when the Philadelphia Inquirer article was published; and on May 11, 2001, when he filed his original complaint in this action in the District Court. Thus, we keep these incidents in mind when writing our opinion and assume, as do the Appellees, that these incidents qualified as protected activity.

### 1.    Miller, Dunbar, Armitage, and Cameron

On appeal, Oliva presses most forcefully his section 1981 claims against Miller, Dunbar, Armitage, and Cameron. Miller was the Commander of Troop A responsible for transfering Oliva from the Woodbine Station to the Buena Vista Station in early 2000 and from Buena Vista back to Woodbine the following August, transfers Oliva asserts constituted illegal retaliation for his objections regarding profiling. The District Court rejected Oliva's claim with respect to the first transfer because it caused him only a trivial harm inasmuch as his commute to Buena Vista was only 4.25 miles longer than his commute to Woodbine, and because there was no evidence in the record that Miller knew or could have known about Oliva's racial profiling complaint to Gordillo, the only protected activity in which Oliva by that time had engaged.[15]

_____

[15]Oliva contends that both transfers were retaliatory. Though the District Court focused primarily on the first transfer, its discussion of whether that transfer was retaliatory incorporated

22

We agree with the District Court on both these points. To start with Oliva does not explain why the transfer to Buena Vista was more than a trivial inconvenience. Second, with respect to a retaliatory motive, Oliva points only to Miller's alleged comment that he was "pissed" at Oliva because of the "Troop Rumblings" incident. Such an offhand remark, made after both transfers, would not provide a foundation on which a reasonable factfinder could predicate a finding that the transfers were in retaliation for Oliva's complaints about racial profiling.

Moreover, even if Oliva supplied evidence demonstrating that he had established a prima facie case of retaliation by pointing to the transfers, Appellees put forth legitimate non-retaliatory reasons for both transfers that Oliva has failed to rebut. Appellees produced evidence that the early 2000 transfer to the Buena Vista Station was consistent with State Police practice of assigning new recruits to their first two stations for approximately six months each and then to a third station for an indefinite period of time. Furthermore, Miller explained that the August 2000 transfer was part of a larger personnel movement undertaken to fill a vacancy and reduce the commutes of several troopers. There is no evidence in the record showing that Miller's explanation was untrue. Accordingly, we will affirm the District Court's

facts pertaining to the second transfer, namely, that the transfer resulted from the movement of other troopers among stations so that those troopers could be stationed closer to their homes. In the circumstances, we are treating his complaint as alleging that both transfers were made in violation of section 1981.

order granting summary judgment to Miller on Oliva's section 1981 claim.

Oliva alleges that Superintendent Dunbar retaliated against him by deciding in January 2001 to transfer him from the Woodbine Station to the Tuckerton Station, which Oliva describes as "the epicenter of [Lords of Discipline] activity," instead of to the Bass River Station in Troop B as Oliva requested. Appellants' br. at 47. The District Court determined that even if the transfer to Tuckerton was a materially adverse employment action, no reasonable factfinder could find a causal connection between that transfer and Oliva's complaints about racial profiling because there was no evidence that Dunbar knew of Oliva's complaints.

Even assuming that a trier of the fact could infer that Dunbar knew of Oliva's complaints, the case against Dunbar could not survive his summary judgment motion for, as the District Court held, Dunbar put forward a legitimate non-discriminatory reason for the transfer that Oliva failed to rebut. Specifically, Dunbar stated that he denied Oliva's request to go to Bass River because he did not want to establish a precedent that any trooper simply could choose to transfer to any station that he or she desired. Inasmuch as we do not find any error in the District Court's conclusions, we will affirm the grant of summary judgment to Dunbar on Oliva's section 1981 claims.

Oliva claims that Armitage and Cameron retaliated against him by changing his status in the IAIB investigation from complainant to principal. By the time of this change the Philadelphia Inquirer had published the article regarding

24

racial profiling, Oliva had filed this action and his administrative complaint, and Armitage and Cameron had interviewed Oliva regarding his racial profiling allegations. Thus, Armitage and Cameron plainly knew of Oliva's racial profiling complaints when there was a change in Oliva's status in the investigation. In recognition of the reality that a concern about becoming targeted in an internal investigation by making a complaint about discrimination could dissuade a reasonable person from making such a complaint, the District Court determined that a reasonable factfinder could conclude Oliva had established a prima facie case of retaliation against Armitage when she changed his status in the investigation. The Court concluded, however, that Oliva had not made a prima facie case against Cameron because Cameron had not been involved significantly in the decision to designate Oliva as a principal in the investigation. We agree with the Court on both these points.

But the District Court's initial conclusion for Oliva with respect to his claim against Armitage did not help him for the Court held that Armitage had overcome Oliva's prima facie case by advancing legitimate non-discriminatory reasons for naming Oliva as a principal in the investigation. In this regard, we point out that by any conceivable standard it was perfectly appropriate for Armitage to make this designation after Oliva admitted to falsifying police reports and to being present at illegal stops and searches that Gallagher conducted. Moreover, Armitage made this designation after interviewing various motorists involved in the questionable stops, two of whom submitted to polygraph examinations, the results of which indicated that they had been truthful in giving accounts implicating Oliva in illegal stops and searches. The Court

25

quite reasonably noted that it was significant that Armitage made her decision with respect to Oliva's status shortly after the results of the polygraph examinations became available to her.

In an attempt to paint these proffered reasons for the change of his status in the investigation from complainant to principal as pretextual, Oliva notes that (1) he was not informed of his designation as principal until one month after the decision to change his status, a delay that contravened State Police policy that a principal in an internal investigation be advised of the charges against him or her in advance of the formal designation; (2) the accounts of the interviewed motorists were implausible because they contradicted Oliva's own accounts; and (3) he was not interviewed as a principal until September 2002, after the investigation formally had been closed. But in light of Oliva's at times conflicting admissions to the IAIB investigators and the circumstance that his failure to contact the investigators led to the delay of his interview as a principal, a reasonable inference cannot be drawn that the decision naming him as a principal likely was motivated by a desire to retaliate against him for complaining about racial profiling. Accordingly, we will affirm the District Court's grant of summary judgment to Armitage and Cameron on Oliva's section 1981 claims.

### 2.    Izzi

Oliva alleges that Izzi retaliated against him by determining he was fit to return to full duty status in August

2001 despite other physicians' contrary recommendations. Inasmuch as Izzi made his recommendation after Oliva's allegations of racial profiling had become widely known, the District Court assumed without deciding that Oliva had established a prima facie case of section 1981 retaliation against Izzi. But the Court then went on to find that Izzi's proffered reason for the recommendation could not have been a pretext for retaliation, a finding with which we agree.

The record shows that Izzi made his recommendation based on the results of the independent EOSHI evaluations. Izzi did not initially credit Oliva's private physicians' opinions that he should not return to duty because Izzi believed that treating physicians often act as patient advocates and thus are not objective. Izzi made his subsequent decision to continue Oliva in an off duty capacity because of new information that he received from Dr. Carty and the private physicians including Dr. Carty's belief that Oliva was using alcohol excessively. Nevertheless, as evidence of pretext, Oliva argues that Izzi ignored serious concerns related to Oliva's medical state raised in the EOSHI report. Yet these concerns cannot undermine Izzi's recommendation inasmuch as the evaluators who compiled the report did not believe that the concerns prevented Oliva from returning to active duty. We therefore will affirm the District Court's grant of summary judgment to Izzi on this claim.[16]

---

[16]Oliva also notes that Izzi's file on Oliva contained press coverage of Oliva's whistle-blowing activities, "suggesting Izzi's 'concern' for Oliva had little to do with medical treatment," and that Izzi maintained the file for years after

27

### 3.     The Remaining Appellees

The District Court found that Oliva's section 1981 claims against Sokorai, Meyers, Austin, MacFarland, Lupu,[17] Schairer, and Zulawski failed because no reasonable factfinder could conclude that a desire to retaliate against Oliva for engaging in protected activity motivated these Appellees' actions. In particular, the District Court did not find any evidence that any of these Appellees were aware of

Oliva's suicide. Appellant's br. at 52. But this evidence would not allow a reasonable factfinder to conclude that Izzi's recommendation was more likely motivated by a desire to retaliate against Oliva than by Izzi's medical opinion, based on the EOSHI report. Indeed, it is a general business and professional practice to maintain files in situations that a reasonable observer can see are likely to lead to litigation and it is understandable that Izzi kept Oliva's file close at hand. In fact, failure to maintain such files sometimes leads to spoliation claims. Moreover, it is logical to include press coverage among the retained documents as such materials might include germane information relating to a potential legal action. We also point out that a regulation of the New Jersey Board of Medical Examiners required Izzi to maintain any treatment record of Oliva for a period of seven years from the date of the most recent record entry. N.J. Admin. Code § 13:35-6.5 (2010).

[17]The District Court pointed out that Lupu "issued three negative performance notices to Oliva . . . [but] there is no evidence in the record, nor does [Oliva] argue, that those notices were unwarranted." Estate of Oliva, 579 F. Supp. 2d at 672.

Oliva's complaints about racial profiling while he was stationed at the Bellmawr and Buena Vista Stations. On appeal, Oliva does not point to facts in the record undermining this conclusion that would permit the drawing of a reasonable inference that a retaliatory animus motivated these Appellees' actions. Accordingly, we will affirm the Court's dismissal of Oliva's section 1981 claims against these Appellees. We also will affirm the District Court's grant of summary judgment on Oliva's section 1981 claims in favor of the remaining Appellees as Oliva does not present any arguments on appeal that challenge the Court's findings with respect to these Appellees.

B.      Oliva's Claims under section 1985(3)

Oliva argues that Appellees conspired to violate his civil rights in contravention of 42 U.S.C. § 1985(3). "Section 1985(3) permits an action to be brought by one injured by a conspiracy formed 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.'" Thomas v. Independence Twp., 463 F.3d 285, 298 (3d Cir. 2006) (quoting Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006)). To survive a motion for summary judgment on his section 1985(3) claim, Oliva first was required to put forward facts that would allow a reasonable factfinder to conclude that Appellees formed a conspiracy to deprive him of his rights. See Farber, 440 F.3d at 134 (citing United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29, 103 S.Ct. 3352, 3355-56 (1983)). In

29

the present context these facts would need to show that there was a conspiracy to harass and retaliate against him for complaining about racial profiling. See Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997) ("[T]he reach of section 1985(3) is limited to private conspiracies predicated on 'racial, or perhaps otherwise class based, invidiously discriminatory animus.'") (quoting Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798 (1971)).

Oliva argues that "every instance of harassment and retaliation was part and parcel of the [New Jersey State Police]'s plan to show Oliva that his criticism of State Police practices would not be tolerated." Appellant's br. at 59-60. We already have concluded that the record fails to provide a basis for a reasonable inference that any of the actions that Miller, Dunbar, Sokorai, Armitage, Cameron, Myers, Austin, MacFarland, Lupu, Schairer, Zulawski or any of the other Appellees took were in retaliation against Oliva for complaining about racial profiling. The record thus cannot support the drawing of a reasonable inference that any of the Appellees took these alleged actions in furtherance of a conspiracy to retaliate against Oliva for complaining about racial profiling. We therefore will affirm the District Court's grant of summary judgment to Appellees on Oliva's claims under section 1985(3).

C.     Oliva's Claims under the CEPA

Oliva also brings claims under the New Jersey CEPA which provides in relevant part that:

> An employer shall not take any retaliatory action against an employee because the employee . . . [o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes. . . is in violation of a law . . . .

N.J. Stat. Ann. § 34:19-3(c)(1). As the District Court observed, the elements required to prove a CEPA claim mirror those required to prove a retaliation claim under section 1981. Estate of Oliva, 579 F. Supp. 2d at 684. Therefore, Oliva's failure either to put forth evidence that a desire to retaliate against him for his complaints about racial profiling motivated Appellees or that their stated reasons for their actions were a pretext for retaliation dooms Oliva's CEPA claims. See Dzwonar v. McDevitt, 828 A.2d 893, 900 (N.J. 2003); Fleming v. Correctional Healthcare Solutions, Inc., 751 A.2d 1035, 1041 (N.J. 2000). Accordingly, we will affirm the District Court's grant of summary judgment to Appellees on these claims.

### D. Oliva's Claims under the LAD

Oliva pled additional state law claims pursuant to the New Jersey LAD for retaliation and hostile work environment. The District Court found that the CEPA's waiver provision barred this claim. That provision recites that:

31

> . . . the institution of an action in accordance with [CEPA] shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

N.J. Stat. Ann. § 34:19-8. The New Jersey Supreme Court has construed this provision to preclude a litigant who has instituted a CEPA claim either from pursuing a separate state law claim for retaliatory discharge, or any other state law claim that requires the same proofs as those needed to satisfy a CEPA claim. See Young v. Schering Corp., 660 A.2d 1153, 1160-61 (N.J. 1995). "It is beyond dispute that the framework for proving a CEPA claim follows that of a LAD claim." Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 466 (D.N.J. 2009) (quoting Donofry v. Autotote Sys., Inc., 795 A.2d 260, 269 (N.J. Super. Ct. App. Div. 2001)). Because Oliva grounds his LAD claims on allegations of retaliation, the CEPA's waiver provision precludes their prosecution.

###### E.     Leave to Amend the Complaint

In opposition to Appellees' motion for summary judgment, Oliva sought for the first time to amend his complaint to include a claim for First Amendment retaliation under 42 U.S.C. § 1983. The District Court denied Oliva leave to amend his complaint to include this claim because at the time of the motion for summary judgment, the case had

been pending in the Court for more than seven years, Oliva already had amended his complaint twice, the presence of a potential First Amendment retaliation claim long had been apparent, and Appellees would be prejudiced by allowing an amendment. Estate of Oliva, 579 F. Supp. 2d at 679.

Federal Rule of Civil Procedure 15(a)(2) provides that a court freely should grant leave to amend a complaint when justice so requires. Nevertheless, a district court may exercise its discretion to deny leave to amend a complaint in situations in which the plaintiff has delayed seeking leave to amend if the delay "is undue, motivated by bad faith, or prejudicial to the opposing party." Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir. 2008) (citing Adams v. Gould, 739 F.2d 858, 864 (3d Cir. 1984)). Delay is "undue" when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend. Id. Irrespective of whether Appellees would have suffered prejudice from Oliva's late assertion of a First Amendment claim, Oliva's delay in seeking leave to amend was undue. The presence of a potential First Amendment retaliation claim was or should have been apparent to him from at least the time that he filed his second amended complaint on February 3, 2003. Moreover, he does not justify his delay in seeking to add such a claim until after Appellees filed their motion for summary judgment on January 15, 2008. In these circumstances, we cannot say that the District Court abused

33

its discretion by denying Oliva leave to amend to assert a First Amendment claim.[18]

## VI. CONCLUSION

John Oliva's experience in the New Jersey State Police was undoubtedly negative, and his story is tragic. Yet we cannot find that he has a right to relief unless he can establish that his various statutory causes of action can be sustained according to their requirements or establish that the District Court abused its discretion in denying him leave to amend his complaint. He has not done so and thus this case must fail. Therefore, we will affirm the order of the District Court, entered on September 30, 2008, granting summary judgment to Appellees and denying Oliva leave to amend his complaint.

---

[18]Because of our procedural disposition of Oliva's motion to amend, we need not consider whether Oliva by restating his claims as alleging a First Amendment violation would have made them more viable.

34