NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1461
_____

SHAWN B. MCCULLERS,

Appellant

v.

JANET NAPOLITANO,∗ SECRETARY,
DEPARTMENT OF HOMELAND SECURITY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-07-cv-04187)
District Judge: Honorable Mary A. McLaughlin
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 2, 2011

Before:  RENDELL, CHAGARES and ALDISERT, Circuit Judges

(Opinion filed: May 12, 2011)
_____

OPINION
_____

---

∗ Pursuant to Fed. R. App. P. 43(c)(2), Janet Napolitano is substituted for her predecessor, Michael Chertoff, as Secretary of the Department of Homeland Security.

PER CURIAM

Shawn McCullers appeals from an adverse grant of summary judgment on his claims of racial discrimination and retaliation by his former employer. He also challenges the District Court's refusal to grant him leave to amend his complaint. We will affirm.

I.

McCullers joined the Philadelphia Field Office of the Federal Air Marshal Service (FAMS) in July 2002.[1] Federal Air Marshals tend to log many hours aboard airplanes and, in October 2004, McCullers was diagnosed with deep vein thrombosis (DVT)[2] and admitted to a hospital. While admitted, McCullers contacted both Donald Anderson, his immediate supervisor, and Karen Jost, FAMS's Administrative Officer, in order to "advise them of his condition and his hospitalization and to request copies of the relevant workers' compensation documents." McCullers submitted workers' compensation documents to Anderson that month, and three months later Anderson forwarded those documents to the Office of Workers' Compensation Programs (OWCP) for processing.[3]

---

[1] We consider the facts in the light most favorable to McCullers. See Colwell v. Rite Aid Corp., 602 F.3d 495, 498 n.2 (3d Cir. 2010).

[2] "DVT is a medical condition that occurs when a blood clot forms in a deep vein, usually in the leg. It can cause serious complications if the clot breaks off and travels to an organ, most commonly to the lungs or brain." Montalvo v. Spirit Airlines, 508 F.3d 464, 469 (9th Cir. 2007).

[3] McCullers initially used a Traumatic Injury Form CA-1 to apply for workers' compensation, but later switched to an Occupational Disease CA-2 Form. As the Government explains, "[a]n occupational disease, unlike a traumatic injury, cannot be

2

During that three-month period (October 2004 through January 2005), Anderson

misled McCullers about the status of his workers' compensation claim, informed

McCullers that his leave time was running low, and stated to McCullers that if he were

not returning to work soon he would have to take advantage of the organization's leave

donor program. In addition, McCullers' initial request to return to work in a light duty

capacity was rejected by Anderson. When he had exhausted his leave time, on November

20, 2004, and because he had not submitted the documentation required for continued

leave, McCullers was placed on absent without leave (AWOL) status, effective

November 30, 2004.[4]

Shortly thereafter, McCullers sent Anderson diagnostic and prognostic updates

relative to his DVT. On December 13, 2004, FAMS emailed McCullers to informally

offer him "a light duty position that will not conflict with restrictions determined by your

physician(s)." The email closed by stating that, "until such time as you report to this

office for your light duty assignment, you will continue to be AWOL." McCullers

responded that day, asking that Anderson "[p]lease write down what the offer is and I will

check my e-mail later to review the details." A more formal offer of the light duty

---

pinpointed to a date and time but, rather, is an injury that develops over time." OWCP
approved McCullers CA-2 claim on January 6, 2005.

[4] McCullers contacted an EEO counselor on December 10, 2004. He eventually
filed an EEOC complaint on March 11, 2005, alleging discrimination "on the bases of
race (Black), disability (Physical), and reprisal (prior EEO activity)." On June 29, 2005,
McCullers filed a second EEOC complaint.

3

position, attached to a December 23, 2004 email from Anderson, followed.  Anderson's

email also stated that McCullers had "fourteen (14) days . . . to respond in writing – and

that no response will be considered a refusal."  Eleven days later, Anderson sent an email

to several FAMS officials stating that he had not yet received an email response from

McCullers, nor had there been a response to multiple voice messages left on McCullers'

phone.[5]  Anderson speculated that "it would appear as if [McCullers] has stopped

monitoring his email account – as I have yet to even receive a 'read receipt.'"

On January 4, 2005—two days before the close of the fourteen-day deadline,

within which Anderson's email had ordered McCullers to respond in writing—

McCullers' access to the FAMS computer system, including McCullers' email account,

was blocked.  That same day, FAMS officers went to McCullers' home to retrieve his

Federal Air Marshal credentials and equipment.   The following month, McCullers

received a notice of proposed removal on the basis of two charges: (1) misuse of a

government-issued credit card[6]; and (2) prolonged AWOL status.  A hearing was held on

the charges and, on June 8, 2005, McCullers was notified that his employment would not

---

[5]  During his deposition, McCullers testified that he had in fact responded to Anderson's phone messages.

[6]  McCullers explained in deposition testimony that he never denied making a withdrawal from his credit card, but that he had "double paid" his bill on one occasion and was merely returning things to the status quo: "At the time that they brought the charge I had a zero balance."

be terminated; instead, he was to be suspended for fourteen days solely on the basis of charge (1). Also on June 8, 2005, McCullers was sent a letter from Robert Clark, an Assistant Special Agent in Charge at FAMS's Philadelphia Office. The letter noted that, to date, McCullers had not "reported for light duty despite our past offers of assigned light duty." The letter directed McCullers to report for duty on June 27, 2005, unless he could submit medical documentation supporting his continued absence. The letter advised McCullers that his failure to comply with its instructions would result in his "being charged with failure to follow a supervisory instruction and action may be initiated to remove [McCullers] from the rolls of the Federal Air Marshal Service."

By letter dated June 27, 2005, McCullers' union counsel mailed a response to Clark, indicating that McCullers was not medically able to return to work, that the OWCP already had on file McCullers' most recent appraisal by his treating physician, and that the order to return to work "does not appear to comply with the rules implementing claims for compensation under FECA."[7] Then, on July 5, 2005, a claims examiner from the United States Department of Labor (DOL) sent a letter to FAMS headquarters, requesting that McCullers be offered a permanent position that, among other things, allowed McCullers "to change position as needed in order to accommodate [his] inability to sit or stand for long periods of time." Attached to the letter was a medical report from

---

[7] Union counsel was referring to the Federal Employees' Compensation Act, codified at 5 U.S.C. § 8101 et seq.

Dr. William J. Schickler, which identified McCullers' "permanent work tolerances and limitations." FAMS rejected the request from DOL, finding significant the omission from Dr. Schickler's evaluation of "the official report of the venous ultrasound performed in April of this year." FAMS officially terminated McCullers' employment, because of his "inability to perform the essential functions of a Federal Air Marshal," on January 23, 2006.[8]

In October 2007, McCullers, acting pro se, filed this complaint in federal district court against Michael Chertoff, then-Secretary of the Department of Homeland Security (the Government), under whose auspices FAMS operates. McCullers alleged that he suffered several adverse employment actions on account of his race, in retaliation for his complaint to Anderson during a staff meeting,[9] and in retaliation for his EEO activity, all in violation of Title VII of the Civil Rights Act (Count I) and 42 U.S.C. § 1981 (Count II). By order entered March 7, 2008, the District Court granted in part, and denied in part,

---

[8] FAMS's official conditions of employment include a provision that states, in relevant part: "An individual may be removed from the position of [Federal Air Marshal] for any lawful reason including [but] not limited to . . . (c.) failure to maintain medical standards for FAM positions . . . [and] (f.) inability to perform an essential function of the position." McCullers' termination notice specified that "[b]eing able to participate in flying missions is an essential function of FAM positions," and that there existed no reasonable accommodations FAMS could provide McCullers such that he could perform that essential function. The termination was made effective January 30, 2006.

[9] In June 2004, McCullers had been "subjected to a counseling session based on his alleged dress code policy violations when he wore a baseball cap during work." Two months later, McCullers was cited for being insubordinate to Anderson during a staff meeting following McCullers' questioning of Anderson about the dress code policy.

the Government's motion to partially dismiss McCullers' complaint. DC dkt #22, pg. 1 ("Count II is dismissed because 42 U.S.C. § 1981 does not apply to persons acting under color of federal law . . . To the extent the motion relates to Count I of the complaint, it is denied as moot because the plaintiff has made clear that he is not bringing a separate claim regarding dress code policy violations and the letter relating to his insubordination.").

In January 2009, McCullers moved to amend his complaint in order to "reassert Count II and to add two additional claims: a claim of disability discrimination under the Rehabilitation Act and the Americans with Disabilities Act ('ADA'); and a constitutional claim for violation of the due process clauses of the Fifth and Fourteenth Amendments." By order entered May 1, 2009, the District Court denied McCullers' motion for leave to amend: the District Court again concluded that § 1981 does not apply to federal actors; it found McCullers' attempt to raise a claim of disability-based discrimination "unduly dilatory" and prejudicial to the Government; and it determined that an amendment to add McCullers' due process claim would be "futile." By order entered January 12, 2010, the District Court granted the Government's motion for summary judgment. McCullers timely appealed.

## II.

The District Court had subject matter jurisdiction under 42 U.S.C. § 2000e and 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291. The District

Court's decision denying McCullers' motion for leave to amend his complaint is reviewed for abuse of discretion. Great W. Mining & Mineral Co. v. Fox Rothschild, LLP, 615 F.3d 159, 175 (3d Cir. 2010). We exercise plenary review of the grant of summary judgment, and apply the same test as the District Court. Brown v. J. Kaz, Inc., 581 F.3d 175, 179 (3d Cir. 2009). "Summary judgment 'should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" EEOC v. The GEO Group, Inc., 616 F.3d 265, 270 (3d Cir. 2010) (quoting Fed. R. Civ. P. 56(c), amended Dec. 1, 2010). We may affirm the District Court on any grounds supported by the record. See Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000).

III.

McCullers raises two overarching claims on appeal: (1) the District Court erred in granting summary judgment on McCullers' retaliation and racial discrimination claims because there existed disputed issues of material fact; and (2) the District Court abused its discretion in denying McCullers leave to amend his complaint in order to add a claim of disability-based discrimination. We address these claims in turn.

A.

1.

In analyzing McCullers' racial discrimination claim, the District Court applied the

three-step, burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). The District Court thus determined that McCullers was first required to establish the following four elements (i.e., a prima facie case) by a preponderance of the evidence: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002). The District Court concluded that McCullers could not establish the fourth element, and we agree that his failure to do so provided sufficient grounds for summary judgment in the Government's favor on this particular claim. See Sarullo v. USPS, 352 F.3d 789, 798 (3d Cir. 2003) ("The central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.") (citation and internal quotations omitted).

McCullers presented negligible[10] evidence that he was terminated from employment with FAMS under circumstances that give rise to an inference of racial discrimination. While McCullers attempted to show that white Federal Air Marshal comparators were disciplined less severely for comparable conduct (e.g., misuse of a

_____

[10] We agree with the District Court's conclusion that, "[a]lthough the plaintiff states in his deposition that another employee heard a supervisor use a racial epithet [when discussing McCullers while he was AWOL], he does not claim that he personally heard the statement nor [does he] provide sufficient context for the statement itself. The plaintiff's bare allegations cannot create an inference of discrimination."

government credit card), those comparators were not in fact "similarly situated" to McCullers. See Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003) ("examples of disparate treatment 'need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and circumstances.'") (citation omitted); Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994) (stating in order to show that an employee is "similarly situated," all of the relevant aspect of employment need to be nearly identical).

Context matters in assessing the factors relevant to the inquiry of whether two employees are similarly situated. In this particular context—workplace disciplinary and/or personnel actions—relevant factors include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000) (citation omitted). Having considered those relevant factors, we conclude that McCullers was unable to identify a similarly situated white comparator; his arguments to the contrary on appeal are unpersuasive, and it was proper for the District Court to grant summary judgment in favor of the Government on this particular claim.

2.

Whether the Government was entitled to summary judgment on McCullers

retaliation claim is a closer call, but, like the District Court, we answer that it was. As with a claim for racial discrimination, under McDonnell Douglas, the plaintiff claiming retaliation must also bear the initial burden of demonstrating a prima facie case. The plaintiff does this by showing that (1) he engaged in protected conduct; (2) his employer took adverse action; and (3) there is a causal link between the protected conduct and the adverse action. See Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002). In addition, exactly *when* a defendant learns about the plaintiff's protected activity is an important consideration in determining whether there is a link between that activity and a particular adverse employment action. See Clark County School Dist. V. Breeden, 532 U.S. 268, 273 (2001) (per curiam). Here, there is no dispute that McCullers contacted an EEO counselor on December 10, 2004, and filed his complaints with the EEOC on March 11, 2005, and June 29, 2005. Those are all protected activities under Title VII. See 42 U.S.C. § 2000e-3(a). The next question, then, is whether the Government took adverse action against McCullers thereafter.

Adverse employment actions in the retaliation context are "not limited to discriminatory action that affect the terms and conditions of employment." Burlington N. and Sante Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). Rather, a plaintiff must show that the alleged retaliatory action was "materially adverse," meaning that it might well have dissuaded a reasonable worker from engaging in protected EEO activity. See id. At 68. With that in mind, we address the many actions alleged by McCullers to have been taken

11

in retaliation for his EEO activity: (1) McCullers' placement on AWOL status on November 30, 2004; (2) FAMS's failure to offer McCullers a formal light duty assignment on December 10, 2004; (3) the retrieval of McCullers' equipment and credentials on January 4, 2005; (4) FAMS's termination of McCullers' access to its computer system on January 4, 2005; (5) the delay in FAMS's processing McCullers' workers' compensation claim, which was approved on January 5, 2005; (6) FAMS's proposed removal of McCullers, in February 2005; (7) McCullers' fourteen-day suspension on June 8, 2005; (8) FAMS's refusal to process McCullers' travel voucher, on December 29, 2005; (9) FAMS's refusal to give McCullers in-grade salary increases; (10) FAMS's refusal to allow McCullers to participate in various agency-wide training programs; and (11) the termination of McCullers' employment on January 23, 2006.

Because action (1) predates McCullers' earliest EEO activity, it is inapt in assessing whether there was retaliation in this case. Moreover, based on the evidence adduced by McCullers, and accepting it all as true, we are not persuaded that actions (2) through (10) would have dissuaded a reasonable worker from engaging in protected EEO activity. We have no trouble concluding as a matter of law, though, that action (11)—McCullers' termination on January 23, 2006—was adverse employment action under Title VII.

But was that termination causally connected to McCullers' EEO activity? There are no genuine issues of material fact attendant to that question in this case, so we assess

12

whether the evidence presented meets scrutiny under the law. We have explained on many occasions that causal connectivity can be inferred in three separate ways: from an unusually suggestive temporal proximity between the protected activity and the adverse action, from an intervening pattern of antagonism following the protected conduct, or from the proffered evidence examined as a whole. Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1999). None of the three methods are availing to McCullers.

McCullers filed his complaints with the EEOC on March 11, 2005, and June 29, 2005. "[B]oth Title VII and its implementing regulations require that an employer be given notice within 10 days of filing." Breeden, 532 U.S. at 273 (citing 42 U.S.C. §§ 2000e-5(b), (e)(1); 29 C.F.R. § 1601.14 (2000)). Even accepting for purposes of this appeal that the Government did not learn of McCullers' second EEO complaint until August 9, 2005,[11] there is nothing "unduly suggestive" about the passage of time between that date and January 23, 2006. See, e.g., Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 760 n.4 (3d Cir. 2004) (holding that "over two months" between protected activity and averse employment action "is not so close as to be unduly suggestive.") (citations omitted).

Furthermore, although the evidence suggests that McCullers' relationship with

---

[11] The Government proffered evidence that Anderson learned of McCullers' EEO activity as early as February 4, 2005. We use the August 9, 2005 date, though, because it gives McCullers the best chance to demonstrate temporal proximity between his protected conduct and his termination from employment.

Anderson took a dramatic change for the worse in the summer of 2004, we agree with the District Court that, "[i]n terms of circumstantial evidence, [McCullers] does not demonstrate a pattern of antagonism nor [does he] allege that any antagonism escalated after he filed his EEO complaints." Cf. Robinson v. SEPTA, 982 F.2d 892, 895 (3d Cir. 1993) (where we determined that the district court "could reasonably find that the initial series of events . . . caused Robinson's and SEPTA's relationship to deteriorate, and set a pattern of behavior that SEPTA followed in retaliating against Robinson's later efforts at opposing the Title VII violations he perceived."). Finally, our examination of the record as a whole does not reveal a causal connection between McCullers' EEO activity and his eventual termination; if anything, the evidence, viewed in the light most favorable to McCullers, suggests that every one of FAMS's actions deemed adverse by McCullers was taken on account of his medical condition.

## B.

McCullers' medical condition was the primary basis for his motion for leave to amend his complaint in order to add a claim under the Rehabilitation Act (RA) and/or the ADA. The motion was filed on January 26, 2009, more than fifteen months after McCullers had initiated litigation in federal court. The District Court denied McCullers' motion on the grounds that the request was dilatory and allowing amendment would unduly prejudice the Government. McCullers claims on appeal that this was an abuse of the District Court's discretion because, inter alia, his delay in seeking amendment to add a

14

claim of disability-based discrimination is attributable to his pro se status and his efforts to "balance life's demands: school, understanding the practical aspects of this case, and parenting." McCullers contends that the Government would not have suffered prejudice from the amendment because it "had and took advantage of [its] right to depose the Appellant with regard to his medical injuries and [to] review all relevant medical records, and admittedly used this information in preparation for their defense."[12]

"Amendments to pleadings are governed by Federal Rule of Civil Procedure 15(a), which provides that 'a party may amend its pleading only with the opposing party's written consent or the court's leave. The Court should freely give leave when justice so requires." Great W. Mining & Mineral Co., 615 F.3d at 174. Nevertheless, leave to amend the complaint may be denied where the plaintiff has "delayed seeking leave to amend," Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 803 (3d Cir. 2010), and the delay "is undue, motivated by bad faith, or prejudicial to the opposing party." Id. (quoting Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir. 2008)).

In denying leave to amend for addition of a claim under the Rehabilitation Act, the District Court reasoned, in pertinent part, as follows:

> Amendment to add the plaintiff's Rehabilitation Act/ADA claim is

---

[12] McCullers also argues that the District Court should have permitted amendment under Fed. R. Civ. P., Rule 15(c), which allows for "relation back" of a pleading amendment in three discrete circumstances. This argument was not raised below and we decline to exercise our discretion to consider it for the first time on appeal. See Nelson v. Cnty. of Allegheny, 60 F.3d 1010, 1013 n.3 (3d Cir. 1995).

15

unduly dilatory. Although the plaintiff alleges that he has discovered 'new information that supports his claim,' the allegations stated in his proposed amended complaint . . . are virtually identical to those stated in support of his Title VII claim in his original complaint filed in October 2007. The plaintiff was not unaware of the possibility of filing a disability discrimination claim – he filed such a claim with the EEO[C] in 2005.

DC dkt #65, pg. 3.

We first observe that we owe great deference to the district courts when they decline to exercise their discretion to permit amendments to pleadings. See Bjorgung, 550 F.3d at 266 ("District courts are the experts in the field of applied trial procedure, so appellate courts should not be quick to reverse such decisions."). Thus, while we recognize that McCullers has handled this case pro se from its inception and, further, that his request for amendment was only his first, the portion of the District Court's May 1, 2009 memorandum opinion that we have quoted above has not been contradicted by McCullers and it unequivocally demonstrates that the District Court did not abuse its discretion in denying leave to amend in order for a claim of disability-based discrimination to be included in McCullers' civil action.

IV.

Accordingly, for the reasons given in this opinion, we will affirm the judgment of the District Court.[13]

---

[13] McCullers' motion for leave to file an amended brief and appendix, on which the Government has taken "no position," is granted.

16