PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3521
_____

MILLICENT CARVALHO-GREVIOUS,
                                    Appellant

v.

DELAWARE STATE UNIVERSITY;
JOHN AUSTIN; ALTON THOMPSON
_____

On Appeal from the United States District Court
for the District of Delaware
(D. Del. No. 1-13-cv-01386)
District Judge:  Honorable Gregory M. Sleet
_____

Argued September 27, 2016
Before:  AMBRO, SMITH[*] and FISHER,[**] *Circuit Judges*.

---

[*] Honorable D. Brooks Smith, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on October 1, 2016.
[**] Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

(Filed: March 21, 2017)

Christine E. Burke     **[ARGUED]**
Ari R. Karpf
Karpf Karpf & Cerutti
3331 Street Road
Suite 128, Two Greenwood Square
Bensalem, PA 19020
        *Counsel for Appellant*

Gerard M. Clodomir
James D. Taylor, Jr.   **[ARGUED]**
Saul Ewing
222 Delaware Avenue, Suite 1200
Wilmington, DE 19899
        *Counsel for Appellees*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

In this Title VII retaliation action, Dr. Millicent Carvalho-Grevious appeals from an order of summary judgment granted in favor of her former employer, Delaware State University, and two of its employees, John Austin, then-interim Dean of the College of Education, Health and Public Policy, and Alton Thompson, Provost and Vice President for Academic Affairs.  Dr. Grevious alleges that by retaliating against her for complaining about discriminatory employment

2

practices based on race and gender, the University violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, and that by retaliating against her for complaining about discriminatory employment practices based on race, Dean Austin and Provost Thompson violated 42 U.S.C. § 1981. In this appeal, we consider whether a plaintiff asserting a Title VII retaliation claim must establish but-for causation as part of her prima facie case pursuant to *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013). We hold that, at the prima facie stage, a plaintiff need only proffer evidence sufficient to raise the inference that her engagement in a protected activity was the *likely reason* for the adverse employment action, not the but-for reason.

With respect to Dr. Grevious's contract revision claim against the University and Provost Thompson, we will reverse the District Court's order and remand for further proceedings. We will affirm in all other respects.

I

The University hired Dr. Grevious as an associate professor and as chairperson of the Department of Social Work (the "Department") in August 2010.[1] Both terms of employment were contracted to end on June 30, 2011, but were subject to reappointment. As chairperson, Dr. Grevious supervised nine employees and managed the Department. But her main focus was to facilitate the Department's reaccreditation efforts, which included submitting a comprehensive self-study and other supporting documentation to the Office of Social Work Accreditation

---

[1] As a University employee, the general terms and conditions of Dr. Grevious's employment were governed by a collective bargaining agreement ("CBA"). J.A. 327-455.

("OSWA") by August 1, 2011. Dr. Grevious reported to Dean Austin, who in turn reported to Provost Thompson. Provost Thompson was primarily responsible for the Department's reaccreditation.

From the beginning of Dr. Grevious's employment, she struggled with the reaccreditation process, in part due to the Department being in "complete disarray," and in part due to the faculty and staff's lack of structure. Grevious Br. 5. Dr. Grevious also experienced personal difficulties with the Department faculty and staff. Within her first three months as chairperson, Dr. Grevious recommended the nonrenewal of two professors, the replacement of two of her administrative staff, and the termination of a Department consultant. Three of those individuals submitted written complaints to Dean Austin describing Dr. Grevious's actions as "unprofessional and unwarranted," claiming to have been "degraded, belittled, and harassed," J.A. 188-95, and subjected to "retribution" related to Dr. Grevious's personal grudges, J.A. 204-05. Although her relationships with junior faculty and staff were strained, two senior faculty members and some of her students submitted positive evaluations of her performance as part of the University's formal evaluation process.

The Department scheduled an election in February 2011 to determine whether Dr. Grevious would be reappointed as chairperson for an additional term. As the election approached, Dr. Grevious's relationship with Dean Austin soured. On January 20, 2011, Dr. Grevious requested a meeting with Provost Thompson to discuss, among other things, her frustrations with Dean Austin's governance. Dr. Grevious claimed that Dean Austin was hindering the reaccreditation process and campaigning against her reappointment as chairperson by soliciting junior faculty

4

members to vote against her. She asked Provost Thompson to intervene. J.A. 212-13.

*Dr. Grevious's first complaint of discrimination and retaliation*

On January 27, having failed to resolve her issues with Dean Austin, Dr. Grevious emailed Provost Thompson regarding what she described as Dean Austin's "unilateral and arbitrary management style" and, for the first time, to report that he allegedly made discriminatory comments. J.A. 231-33. Dr. Grevious alleged that, when she confronted Dean Austin, he told her that his "management style was meant to stop 'back biting among women, especially Black women,' that is keep [*sic*] women from fighting amongst themselves to their own detriment." J.A. 232. Dr. Grevious complained that she found Dean Austin "overtly sexist" and claimed that he reduced "interpersonal interaction between a department chair and her faculty and staff to race and gender issues, as a cover for making unilateral decisions." J.A. 232-33.

On February 14, Provost Thompson spoke to Dean Austin, who denied making the alleged discriminatory comments. The following day, Dean Austin formally evaluated Dr. Grevious as chairperson. In the category addressing academic leadership and Department activities, Dean Austin rated Dr. Grevious a one out of five and commented that her "[l]eadership appears to be a major problem." J.A. 238. Dr. Grevious contested the evaluation, and the next day Dean Austin submitted a revised, more-favorable evaluation. In the aforementioned category, Dean Austin upgraded Dr. Grevious's rating from a one to a two out of five and commented that "[w]hile Chair indicates the activities she has accomplished in her academic development,

5

there is no clear indication where she is demonstrating leadership and development of faculty and staff." J.A. 241.

In an email to Provost Thompson and the University's general counsel, sent early on the morning of the Department election (February 16, 2011), Dr. Grevious argued that Dean Austin's negative evaluation evidenced his retaliatory animus toward her for reporting his misconduct. Dr. Grevious referenced the allegations raised in the January 27 email and requested that Provost Thompson insulate the election from Dean Austin's interference. Because Dr. Grevious was unable to produce evidence of Dean Austin's interference, the election went forward as scheduled. Including Dr. Grevious, the faculty voted five to four to appoint Dr. Marlene Saunders as the new Department Chair, effective June 30, 2011.[2]

On March 1, 2011, in accordance with the CBA, Dr. Grevious filed a grievance with the Office of the Provost alleging that Dean Austin sexually harassed her and that, when she reported Dean Austin's harassment to the Provost, Dean Austin retaliated by submitting a negative performance evaluation. J.A. 249-62. Responding to the grievance on behalf of the University, Provost Thompson stated that further action was unnecessary because investigations into Dr. Grevious's claims did not yield evidence of CBA violations. J.A. 266.

*The University issues Dr. Grevious a renewable contract*

On April 1, 2011, based on Provost Thompson's recommendation, the University tendered to Dr. Grevious a renewable contract as an associate professor for the 2011-2012 academic year. J.A. 269. Around the same time,

---

[2] Dean Austin oversaw the election but, pursuant to the CBA's procedures, did not vote. *See* J.A. 441.

6

Provost Thompson learned that, under Dr. Grevious, the Department's progress toward reaccreditation was significantly behind schedule. Provost Thompson requested a one-year postponement of the reaccreditation deadline, citing the transition to a new chairperson as his justification. J.A. 279. On April 14, OSWA denied the request. That same day, Dr. Grevious filed a formal complaint of sexual harassment, racial discrimination, and related retaliation against Dean Austin with the University's human resources department ("HR"). J.A. 271-78.

*The University prematurely terminates Dr. Grevious's term as chairperson*

On May 3, 2011, Dr. Grevious met with the vice president of HR to discuss her complaint.[3] Later that day, the University informed Dr. Grevious that she would be dismissed as chairperson on May 6, but that she would continue to receive the chairperson salary through the natural expiration of her contract term. J.A. 280. In response, on May 20, Dr. Grevious filed an Equal Employment Opportunity Commission ("EEOC") charge of discrimination claiming that the premature termination of her term as chairperson was unlawful retaliation for her complaints about Dean Austin's sexual harassment, racial discrimination, and related retaliation. J.A. 282-83. Dean Austin, Provost Thompson, and the University became aware of the EEOC charge sometime in early June. J.A. 177.

*The University issues Dr. Grevious a revised terminal contract*

---

[3] Ultimately, the investigation was closed due to a lack of corroborating evidence.

On June 21, 2011, based again on Provost Thompson's recommendation, the University revoked Dr. Grevious's April 1 renewable contract and issued her a terminal contract ending her employment effective May 25, 2012. J.A. 284. Dr. Grevious claims that on August 2, at a meeting to discuss the issuance of the terminal contract, Provost Thompson admitted that his recommendation was based on Dr. Grevious's filing of the May 20 EEOC charge and that the ultimate decision was unrelated to her teaching or professional performance. J.A. 290, 307. Dr. Grevious thereafter filed a second EEOC charge alleging that she was issued a terminal contract in retaliation for having filed the initial EEOC charge. J.A. 295. Provost Thompson denies making such admissions at the August meeting and claims that the decision was based on Dr. Grevious's documented interpersonal conflict at the University.

The following year, on June 22, 2012, when the terminal contract expired, Provost Thompson recommended that the University not reappoint Dr. Grevious for the 2012-2013 academic year because of her consistent "inability to work collegially" with her colleagues. J.A. 297. Dr. Grevious subsequently filed a final EEOC charge alleging that her ultimate termination was retaliation for filing the earlier EEOC charges. J.A. 317.

After exhausting her administrative remedies, Dr. Grevious filed this suit in the District Court for the District of Delaware alleging retaliation in violation of Title VII, 42 U.S.C. § 2000e-3, against the University, and retaliation in violation of 42 U.S.C. § 1981 against Dean Austin and Provost Thompson (collectively "the Defendants"). The Defendants moved for summary judgment on the basis that Dr. Grevious failed to raise a triable issue of fact with respect

to the third element of her prima facie case—causation. In granting the Defendants' motion for summary judgment, the District Court relied primarily on *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), which held that a plaintiff asserting a Title VII retaliation claim must prove that the employer's unlawful retaliation was the but-for cause of the adverse employment action, *see Carvalho-Grevious v. Delaware State Univ.*, No. 13-1386, 2015 WL 5768940, at *4 (D. Del. Sept. 30, 2015). The District Court concluded that no reasonable jury could find that, but for Dr. Grevious's complaints about harassment and discrimination, she would have been retained as chairperson or kept her renewable contract. Therefore, it held that Dr. Grevious did not establish the causation element of her prima facie case. *See id.* at *5. The District Court also concluded that Dr. Grevious failed to establish that Provost Thompson's non-retaliatory explanation for the issuance of a terminal contract was a pretext for discrimination. *Id*. Dr. Grevious filed this timely appeal.

## II

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's order granting summary judgment and apply the same standard the district court applied. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015). We will affirm if, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

## III

Title VII prohibits an employer from discriminating based on an employee's race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2(a), and from retaliating against an employee for complaining about, or reporting, discrimination or retaliation, *id.* § 2000e-3(a). "The substantive elements of a [racial discrimination] claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009). We will therefore address these claims together. *See, e.g.*, *Schurr v. Roserts Int'l Hotel Inc.*, 196 F.3d 486, 498-99 (3d Cir. 1999). Title VII and § 1981, however, are not coextensive, and to the extent that any of Dr. Grevious's retaliation claims against either Provost Thompson or Dean Austin are based on Dr. Grevious's complaints of gender discrimination, those claims are not cognizable. *See Anjelino v. New York Times Co.*, 200 F.3d 73, 98 (3d Cir. 1999) (affirming dismissal of § 1981 gender discrimination claim on the basis that § 1981, "on its face, is limited to issues of racial discrimination").

To state a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). A plaintiff seeking to prove her case through indirect evidence, as Dr. Grevious seeks to here, may do so by applying the familiar *McDonnell Douglas* burden-shifting framework. *Daniels*, 776 F.3d at 198-99. After establishing a prima facie case of retaliation, the burden shifts to the employer to provide a legitimate non-retaliatory reason for its conduct. *Moore*, 461 F.3d at 342. If it does so, the burden shifts back to the plaintiff "to convince the factfinder both that the

10

employer's proffered explanation was false [that is, a pretext], and that retaliation was the real reason for the adverse employment action." *Id*. The onus is on the plaintiff to establish causation at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case, and at the final stage of the *McDonnell Douglas* framework to satisfy her ultimate burden of persuasion by proving pretext.

The question before us is what a plaintiff must bring as part of her prima facie case of retaliation to survive a motion for summary judgment in the wake of the Supreme Court's decision in *Nassar*, which held that "Title VII retaliation claims must be proven according to traditional principles of but-for causation." 133 S. Ct. at 2533. Our sister circuits are split on this question. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 251 n.10 (4th Cir. 2015) (collecting cases). We conclude that *Nassar* does not alter the plaintiff's burden at the prima facie stage; proving but-for causation as part of her ultimate burden of persuasion comes later, and not at the motion-to-dismiss stage.

Importantly, the "but-for" causation standard required by *Nassar* "does not conflict with our continued application of the *McDonnell Douglas* paradigm" in Title VII retaliation cases. *Smith v. Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (analyzing *Gross v. FBL Financial Services*, 557 U.S. 167 (2009), and the "but-for" causation requirement in proving claims under the Age Discrimination in Employment Act). Applying *McDonnell Douglas* to Title VII retaliation claims, we have made clear that "[a]lthough the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times." *Daniels*, 776 F.3d at 193. Because the *McDonnell Douglas* framework affects the

11

burden of production but not the standard of causation that the plaintiff must prove as part of her ultimate burden of persuasion, *Nassar* "does not forbid our adherence to precedent applying *McDonnell Douglas*." *Smith*, 589 F.3d at 691.

A

A plaintiff asserting a claim of retaliation has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination under Title VII. *See* 42 U.S.C. § 2000e–2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice.") (emphasis added); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 932-35 (3d Cir. 1997) (holding that the Civil Rights Act of 1991's addition of § 2000e–2(m)'s "motivating-factor" standard of causation does not apply to Title VII retaliation claims). In *Woodson*, we held that a plaintiff must prove that retaliatory animus had a "determinative effect" on the employer's decision to subject the employee to the adverse employment action. 109 F. 3d at 932. And in *Moore*, we stated the plaintiff's causal burden slightly differently, holding that a plaintiff proceeding under a pretext theory, as Dr. Grevious seeks to here, must convince the factfinder that the employer's proffered non-retaliatory explanation was false, and that retaliatory animus was the "*real reason* for the adverse employment action." 461 F.3d at 342 (emphasis added).

More recently, the Supreme Court concluded that a retaliation plaintiff's ultimate burden is to prove that retaliatory animus was the "but-for" cause of the adverse employment action. *Nassar*, 133 S. Ct. at 2521. As we did in

12

*Woodson*, the *Nassar* Court limited § 2000e–2(m)'s "motivating-factor" standard to status-based discrimination claims. The Supreme Court reasoned that the plain text of § 2000e–2(m)—which is notably silent as to retaliation claims—and the detailed statutory structure of Title VII, indicate that Congress did not intend to extend the "motivating-factor" standard to retaliation claims, which come under § 2000e–3(a). *Id.* at 2528-30; *see also Woodson*, 109 F.3d at 933-36.

Although this Court's "determinative effect" or "real reason" causation standard and the Supreme Court's "but-for" causation standard differ in terminology, they are functionally the same. To prove a "determinative effect," the plaintiff must show "by a preponderance of the evidence that there is a 'but-for' causal connection" between the adverse employment action and retaliatory animus. *Miller v. CIGNA Corp.*, 47 F.3d 586 586, 595-96 (3d Cir. 1995) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).[4] Similarly, a plaintiff who proves that retaliatory animus was the "real reason" for the adverse employment action will necessarily be able "to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Nassar*, 133 S. Ct. at 2525 (internal quotation marks omitted). Regardless of any articulable differences, the Supreme Court has made clear that "Title VII retaliation claims must be

---

[4] The *Nassar* Court even cited *Hazen Paper*'s "determinative influence" standard as an example of the requirement of "[c]ausation in fact—*i.e.*, proof that the defendant's conduct did in fact cause the plaintiff's injury." *Nassar*, 133 S. Ct. at 2524-26 (citing *Hazen Paper*, 507 U.S. at 610).

13

proved according to traditional principles of but-for causation." *Id.* at 2533.

Understanding the retaliation plaintiff's ultimate burden, we turn to the question of whether that burden differs at the prima facie stage of the case. We hold that it does. *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) ("In assessing causation, we are mindful of the procedural posture of the case."); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000) ("[T]he relative evidentiary impact of [causal evidence] may vary depending upon the stage of the *McDonnell Douglas* proof analysis and the procedural circumstance," *i.e.*, if proffered to satisfy a plaintiff's prima facie case for the purpose of summary judgment or if proffered to reverse a verdict). Consistent with our precedent, a plaintiff alleging retaliation has a lesser causal burden at the prima facie stage. *See e.g.*, *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) ("[T]he *prima facie* requirement for making a Title VII claim 'is not onerous' and poses 'a burden easily met.'" (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981))).

Some circuits have found, albeit without much in the way of explanation, that a plaintiff must prove but-for causation as part of the prima facie case of retaliation. *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015) (en banc); *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014). We decline now to heighten the plaintiff's prima facie burden to meet her ultimate burden of persuasion. That is because we agree with the Fourth Circuit that to do so

> would be tantamount to eliminating the *McDonnell Douglas* framework in retaliation cases . . . . If plaintiffs can

14

prove but-for causation at the prima facie stage, they will necessarily be able to satisfy their ultimate burden of persuasion without proceeding through the pretext analysis. Had the *Nassar* Court intended to retire *McDonnell Douglas* and set aside 40 years of precedent, it would have spoken plainly and clearly to that effect.

*Foster*, 787 F.3d at 251. We conclude that at the prima facie stage the plaintiff must produce evidence "sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (emphasis added) (internal quotation marks omitted).

And finally, although the *Nassar* Court did express concern that a lesser causation standard could contribute to the filing of frivolous claims, *see Nassar*, 133 S. Ct. at 2531-32, we do not believe that our holding today will lead to that result. We are confident that Federal Rule of Civil Procedure 11's certification requirements will deter an attorney from filing a frivolous claim of retaliation when his client is patently unable to meet her ultimate causal burden. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (holding that the purpose of Rule 11 "is to deter baseless filings in district court").

B

We now turn to Dr. Grevious's claims of unlawful retaliation. In dispute is whether Dr. Grevious produced evidence from which a reasonable factfinder could conclude that her engagement in a protected activity was the *likely reason* for the adverse employment action at the prima facie

first stage and that the Defendants' explanation (at stage two) was pretext (at stage three).[5]

"[A] plaintiff may rely on 'a broad array of evidence' to demonstrate the causal link between [the] protected activity and the adverse [employment] action taken." *Marra,* 497 F.3d at 302 (quoting *Farrell*, 206 F.3d at 284). She can meet this burden by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986), a pattern of antagonism, *Woodson*, 109 F.3d at 921, or temporal proximity "unusually suggestive of retaliatory motive," *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000) (internal quotation marks omitted). "These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar*, 109 F.3d at 177.

### *Dr. Grevious's chairperson claim*

The District Court erred in applying *Nassar* and concluding that Dr. Grevious needed to establish but-for causation as part of her prima facie case. Still, because we conclude that no reasonable juror could find that Dr. Grevious raised sufficiently the inference of retaliatory animus needed at the prima facie stage, we will affirm the District Court's

---

[5] The parties do not dispute that Dr. Grevious engaged in protected activities when she complained, both formally and informally, about sexual harassment, gender and racial discrimination, and related retaliation, to the Provost's Office, HR, and the EEOC. The parties similarly do not dispute that the University's premature termination of Dr. Grevious's term as chairperson, or its unilateral issuance of a revised terminal contract, constitute adverse employment actions.

16

summary judgment of her chairperson claim.[6] *See Bernitsky v United States*, 620 F.2d 948, 950 (3d Cir. 1980) ("[I]t is well established that we are free to affirm the judgment of the district court on any basis which finds support in the record").

As chairperson, Dr. Grevious served at the pleasure of the Dean. On April 14, 2011, Dr. Grevious submitted a formal HR complaint against Dean Austin. On May 3, the same day that she met with HR to discuss the complaint, Dr. Grevious received notice that her term as chairperson would end prematurely on May 6. Dr. Grevious argues that the temporal proximity between the HR meeting and the termination notice is unusually suggestive of retaliatory motive. We disagree.

First, Dr. Grevious's April 14 HR complaint was exhaustive as to her claims against Dean Austin. Dr. Grevious does not allege that during the May 3 meeting she brought additional claims of discrimination or retaliation, or that she introduced new evidence in support of her pre-existing claims. Nothing changed between April 14 and May 3. We are not persuaded that her same-day notification about the termination of her chairperson term is "unusually suggestive" of retaliatory motive.

Second, we have emphasized that "temporal proximity merely provides an evidentiary basis from which an inference [of causation] can be drawn. The element of causation, which

---

[6] Chief Judge Smith would also affirm the District Court's grant of summary judgment on Dr. Grevious's chairperson claim. In his view, however, Dr. Grevious established a prima facie case of retaliation, but failed to demonstrate that the University's action was a pretext for retaliation.

necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Kachmar*, 109 F.3d at 178. It is undisputed that under Dr. Grevious's leadership the Department was not making sufficient progress toward achieving reaccreditation. Provost Thompson twice lobbied OSWA for a one-year postponement of the August 1 deadline. On April 14, 2011, OSWA denied Provost Thompson's second request. J.A. 279. Given Dr. Grevious's difficulties and the impending reaccreditation deadline, the University instituted the early transition to Dr. Saunders' term. Despite the early transition, Dr. Grevious continued to receive the chairperson salary through the end of her contract term. Consistent with the District Court's assessment, we conclude that Dr. Grevious has failed to produce evidence from which a reasonable factfinder could determine that her engagement in a protected activity was the *likely reason* for the University's premature termination of her chairperson term. Even if Dr. Grevious could establish the element of causation, her claim would necessarily fail because she has not cast any doubt on the University's decision to refocus the reaccreditation efforts in the limited amount of time that remained. We will therefore affirm the District Court's summary judgment of Dr. Grevious's chairperson claim.

*Dr. Grevious's contract revision claim*

Dr. Grevious's contract revision claim presents a closer question. Her appointment as assistant professor was probationary and contracted on a year-to-year basis. J.A. 353. On April 1, 2011, despite her record of interpersonal conflict in the Department, Dr. Grevious received and accepted a

18

renewable contract.[7]   On May 20, Dr. Grevious filed an EEOC charge alleging that the premature termination of her term as chairperson was unlawful retaliation for her engagement in a protected activity.  Although the exact date is unclear, the parties agree that the Defendants learned about Dr. Grevious's May 20 EEOC charge in early June.  On June 21 the University issued Dr. Grevious a revised terminal contract.   The parties dispute whether, on its own, the temporal proximity between Dr. Grevious's protected activity and the issuance of the revised terminal contract suffices to raise the inference of causation.[8]  We need not answer this question, because we find on the record before us that Dr. Grevious has produced sufficient evidence from which a reasonable factfinder could find the requisite inference of causation.

---

[7] The CBA mandates that the University "shall normally notify" employees of the terms and conditions of their employment for the following year on or by April 1. J.A. 345.

[8] The Defendants argue that to determine temporal proximity we should look to the date of Dr. Grevious's first complaint, January 27, 2011, and not to the Defendants' receipt of notice of the EEOC charge. Defendants' Br. 25.  If we look to the date of the first complaint, the intervening period would be five months.  If we look to the date of notice, the intervening period would be three weeks at most.  We have held that, on its own, an intervening temporal period of two days may raise the inference of causation but that a period of two months cannot. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989); *William v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759-60 (3d Cir. 2004).

It is undisputed that there "was a continuous flow of complaints from department faculty and staff . . . . They began immediately upon [Dr. Grevious's] hire and remained consistent in the months that followed." Defendants' Br. 28. Still, after reviewing the faculty, Dean, and students' evaluations, Provost Thompson recommended issuance of a renewable contract. J.A. 174. Nothing in the record indicates that, between April 1 and June 21, anything changed with respect to Dr. Grevious's professional performance other than her escalation from filing intra-University complaints to filing an EEOC charge.

Additionally, in her amended complaint Dr. Grevious alleged that, at their August 2, 2011 meeting, Provost Thompson told her he recommended issuance of a terminal contract because Dr. Grevious "was the cause of trouble in the department (which was only in reference to [Dr. Grevious's] complaints and protected activity)" and that the decision had nothing to do with her performance. Am. Compl. ¶ 28, J.A. 307. As part of her unsworn second EEOC charge, Dr. Grevious claimed that at the August meeting, Provost Thompson admitted that the decision was made in "retaliation for filing the EEOC complaint." J.A. 290. The District Court discounted Dr. Grevious's claim as an "uncorroborated statement." 2015 WL 5768940, at *5. This was error. Credibility determinations are for the factfinder and are inappropriate at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). What makes the District Court's reasoning more problematic is that it also relied on a "contemporaneous" memo offered by Defendants to show a non-retaliatory explanation for their decision. 2015 WL 5768940, at *5. The "contemporaneous" memo, however, is dated June 22, 2012, one year *after* the issuance of the revised terminal contract. J.A. 145. We

20

conclude that, given the absence of a meaningful change in Dr. Grevious's professional performance in the Spring of 2011 and Provost Thompsons's alleged admission, a reasonable factfinder could infer that Dr. Grevious's engagement in a protected activity was the *likely reason* for the issuance of the revised terminal contract.

*The pretext stage of Dr. Grevious's contract revision claim*

We now turn to the pretext stage of the analysis. We rely largely on the evidence produced in support of Dr. Grevious's prima facie case, recognizing that "nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Farrell*, 206 F.3d at 286. At this point, the burden is on the Defendants to articulate a legitimate reason for issuing the revised terminal contract. Importantly, the Defendants' burden is one of production, not of persuasion. *See Daniels*, 776 F.3d at 193 ("the plaintiff has the ultimate burden of persuasion at all times"). The Defendants met this burden by producing evidence that the April 1 contract was not final and that issuance of the terminal contract was based on Dr. Grevious's inability to work collegially in the Department. *See* Defendants' Br. 27.

The burden therefore shifts back to Dr. Grevious to demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" from which a reasonable juror could conclude that the Defendants' explanation is "unworthy of credence, and hence infer that the employer did not act for the asserted [non-retaliatory] reasons." *Daniels*, 776 F.3d at 199 (brackets omitted) (quoting *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014)). Ultimately, the remaining issue is unlawful retaliation *vel non*. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

To prevail at trial, Dr. Grevious need not prove that, had she not filed the May 20 EEOC charge, the University never would have issued her a terminal contract. She only needs to convince the factfinder that, had she not filed that charge, the University would not have issued the terminal contract on June 21, 2011. Her inability to work collegially in the Department existed long before, including when both the renewable and the revised terminal contracts were issued. Typically, before issuing a terminal contract, the University put the at-risk faculty member on a professional improvement plan designed to meet the discrepancies and deficiencies identified in the faculty member's evaluations. J.A. 114. Even in the absence of a plan, the faculty member generally had the right to meet with the appropriate vice president before the ultimate recommendation to issue a terminal contract was submitted to the president of the University. J.A. 386. A reasonable factfinder could determine that the University's failure to extend to Dr. Grevious either of these opportunities and her long-existing difficulty in the Department indicate weaknesses in the Defendants' explanation and suggest pretext. If found to be credible, Provost Thompson's admission of retaliatory animus only strengthens Dr. Grevious's case. Thus we conclude that Dr. Grevious has raised "a factual issue regarding the employer's true motivation" for the revision of her contract, and as such, her claims against the University and Provost Thompson withstand summary judgment. *Jalil*, 873 F.2d at 707.

*Dr. Grevious's remaining claims against Dean Austin*

We will, however, affirm the District Court's summary judgment of all of Dr. Grevious's claims against Dean Austin. The parties do not dispute that Provost Thompson, not Dean Austin, was responsible for recommending issuance of the

22

terminal contract. Dr. Grevious alleges that Dean Austin's retaliatory adverse employment action was the filing of a negative evaluation. But Dr. Grevious has not introduced evidence from which a reasonable factfinder could infer that Dean Austin's negative evaluation was *likely* retaliation against Dr. Grevious for engaging in a protected activity. Dr. Grevious complained about Dean Austin's efforts to undermine her effectiveness as chairperson as early as January 20, 2011, before she first alleged harassment or discrimination. Even if Dean Austin's conduct was motivated by animus, it predated her engagement in protected activities. Moreover, although Provost Thompson may have considered Dean Austin's evaluation of Dr. Grevious, it is not clear that Dean Austin had any meaningful bearing on the ultimate decision to issue the terminal contract. As such, Dr. Grevious has failed to produce evidence from which a reasonable jury could find the requisite causal connection between her protected activity and Dean Austin's alleged retaliatory adverse employment action.

\* \* \*

Accordingly, we will affirm on Dr. Grevious's contract revision claim against Dean Austin, reverse on Dr. Grevious's contract revision claim against the University and against Provost Thompson, and remand for further proceedings consistent with this opinion.