NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1839
_____

SHINIC DAVIS,
Individually and also on behalf of E.D.,
her minor son as his mother and natural guardian,
Appellant

v.

QUAKER VALLEY SCHOOL DISTRICT;
BARBARA MELLETT;
HEIDI ONDEK;
JOSEPH CLAPPER;
ERIK LINDEMANN
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-13-cv-01329)
Chief Judge:  Honorable Joy Flowers Conti
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 8, 2016

Before:  FISHER,* KRAUSE and GREENBERG, *Circuit Judges*.

(Filed: June 5, 2017)

_____

* Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

_____

OPINION[**]

_____

FISHER, *Circuit Judge*.

Shinic Davis, individually and  on behalf her son ("E.D."), brought a race-based discrimination and retaliation suit against the Quaker Valley School District ("QVSD"), and its employees, Dr. Joseph Clapper, Dr. Heidi Ondek, Dr. Barabara Mellett, and Erik Lindemann. Davis appeals the District Court's order entering summary judgment in favor of the Defendants. For the reasons stated below, we will affirm.

I.

This suit concerns E.D.'s behavioral issues in his second-grade classroom and the Defendants' treatment of those issues. E.D. attended Osborne Elementary School in QVSD. At all relevant times, Clapper was QVSD's superintendent, Ondek was the assistant superintendent, Mellet was the principal of Osborne, and Lindemann was E.D's teacher. E.D. was the only African American student in Lindemann's second-grade class during the 2011-2012 academic year.

---

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

As early as October 2011, Davis expressed concern that Lindemann treated E.D. unfairly in relation to his non-minority classmates. She felt that Lindemann blamed E.D. for things that he did not do, and punished E.D. for conduct that he did not punish other students for. Lindemann claims that while other students occasionally engaged in similar conduct, no other student did so with the same frequency or intensity as E.D. He and the other Defendants maintain that E.D. experienced emotional and physical outbursts, which were highly disruptive to the classroom's learning environment. Throughout the fall of 2011, Lindemann suggested ways to address E.D.'s behavioral issues. But Davis was unreceptive. In November, Davis rejected Lindemann's proposal that E.D. join a behavior group on the basis that it was unnecessary and likely, as we may now infer, because Davis was concerned that E.D. was being targeted based on racial discrimination.

The situation escalated as the academic year progressed. Lindemann felt that E.D.'s oppositional behavior was intensifying. At the same time, Davis grew increasingly vocal regarding her concerns of unfair treatment. On January 30, 2012, Davis told Lindemann that she would no longer talk to him about E.D. The next day, Lindemann started a reflection journal in which he recorded E.D.'s behavior and his responses to that behavior. Soon after, Davis threatened litigation. Assistant Superintendent Ondek and Principal Mellet investigated Davis's claims and determined that they were unfounded. Still, Davis continued to complain that the Defendants continued to treat E.D. unfairly,

3

establishing "different standards and practices" for E.D. "in comparison with other students," which led to a "hostile learning environment."[1]

Attempting to find a productive way to address E.D.'s behavior and assuage Davis's concerns, the Defendants recruited Floyd Faulkner, an unbiased third party who works with child-centered agencies in the community. Faulkner met with Davis, and then observed Lindemann's class on February 23. He concluded that Lindemann was attentive to E.D.'s needs and ran the class well. That same day, Lindemann proposed a Responsive to Instruction and Intervention ("RTII") behavioral plan that was uniquely tailored to addressing E.D.'s conduct. The RTII plan included methods to "redirect" E.D.'s behavior. When redirection was ineffective or E.D.'s conduct was highly disruptive, the RTII plan called for removal from the classroom until he calmed down. The Defendants presented the RTII plan to Davis on February 28. She refused to participate in the plan and informed the Defendants that she filed a formal complaint with the Pennsylvania Human Relations Commission ("PHRC") the day before.

To facilitate implementation of the RTII plan and minimize disruption to the rest of the class, Lindemann requested a co-teacher to help manage his classroom. The co-teacher, Nathan Pease, testified that when removal was necessary, he or Lindemann would attempt to calm E.D. down in the hallway. If unsuccessful, they would send E.D.

---

[1] App. 488.

to Principal Mellett's office, or to a "work-away" room until he calmed down. E.D.'s oppositional behavior continued to be an issue and he was suspended in May 2012.

During that academic year, D.I., a Caucasian classmate, also experienced behavioral issues. With the support of D.I.'s mother, Lindemann referred D.I. to a RTII plan. Lindemann kept notes of D.I.'s misconduct before referring D.I. to his RTII plan, but did not keep those notes after importing them into the RTII computer tracking program. Over time, the program created a graph reflecting D.I.'s progress, but the graph does not reflect the nature of D.I.'s conduct. Although not based on personal knowledge, Davis claims that D.I. and E.D. engaged in similar conduct in Lindemann's classroom.

On September 11, 2013, Davis, individually and on behalf of E.D., brought a race-based discrimination and retaliation lawsuit against the Defendants. In granting the Defendants' motion for summary judgment, the District Court concluded that Davis did not establish a prima facie case of discrimination or retaliation. In the alternative, the court also concluded that Davis failed to raise a triable issue of fact from which a reasonable factfinder could find that the Defendants' non-discriminatory reasons for their actions were pretext for discrimination. Because we affirm the District Court's grant of summary judgment on the basis that Davis failed to establish a prima facie case, we do not reach pretext.

II.

The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). We have jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary.[2] In conducting this review, we apply the same standard as the District Court. We view the "underlying facts and all reasonable inferences therefrom in the light most favorable" to Davis, and will affirm if a reasonable factfinder could find only for the Defendants.[3] We review the District Court's denial of spoliation inference for abuse of discretion.[4]

III.

A.

We first address Davis's racial discrimination claims asserted on behalf of E.D.[5] To meet her prima facie burden with respect to these claims, Davis must produce evidence giving rise to an inference of unlawful discrimination.[6]

---

[2] *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).
[3] *Id.*
[4] *See Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012).
[5] On behalf of E.D., Davis brings racial discrimination claims under 42 U.S.C. § 1981 ("Section 1981"), and 42 U.S.C. § 1983 ("Section 1983"), and as against QVSD only, a claim under Title VI of the Civil Rights Act of 1964 ("Title VI"). Insofar as Davis argues that the District Court erred in dismissing her individual claim, that argument is waived because she "did not include any argument with respect to [it] or otherwise explain how the District Court erred." *Free Speech Coal., Inc. v. Att'y Gen. of United States*, 677 F.3d 519, 545 (3d Cir. 2012).

6

Lacking direct evidence supporting her claims, Davis attempts to satisfy her prima facie burden solely through the use of comparator evidence. To be a valid comparator, the individual must be "alike in all relevant aspects."[7] Davis argues that despite engaging in similar conduct and being put on his own RTII plan, D.I., a non-minority student, was treated more favorably than E.D. We agree with the District Court that D.I. is not a valid comparator. First, the record is devoid of evidence showing that D.I.'s misconduct was as frequent or intense as E.D.'s. Second, given the unique nature of each RTII plan, the mere existence of a plan is insufficient to show that D.I.'s misconduct was sufficiently similar to E.D.'s misconduct. And finally, the evidence related to D.I.'s conduct on the school bus does not provide a basis from which a reasonable factfinder could evaluate his conduct in the classroom, and Davis's allegations not based on personal knowledge cannot withstand summary judgment.[8]

To prove that D.I. was a valid comparator, Davis sought a favorable inference based on spoliation of evidence, which the District Court denied. She argues that Lindemann's pre-RTII plan notes would show that D.I. and E.D. engaged in sufficiently

---

[6] *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3d Cir. 2002) ("Title VI and § 1981 provide a private cause of action for intentional discrimination only."); *see also Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990) ("To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." (citation omitted)).

[7] *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (internal quotation marks omitted).

[8] *See Olympic Junior, Inc. v. Davis Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972).

7

similar conduct. To establish spoliation, Davis must show that the notes were in the Defendants' control, related to the claims in the case, actually suppressed or withheld, that there was a reasonably foreseeable duty to preserve the notes, and that the actor withheld or suppressed the evidence in bad faith.[9] Short of imputing to Lindemann a sophisticated knowledge of trial strategy, it was not reasonably foreseeable that Lindemann had a duty to preserve his notes about D.I. pending litigation related to E.D. And even if it was, Davis has not established bad faith. Other than her general assertions that Lindemann harbored resentment towards her and E.D., and that he was concerned about the possibility of litigation, there is no actual evidence that the alleged spoliation was intentional and driven by a "desire to suppress the truth."[10] Thus the District Court did not abuse its discretion in denying Davis's request for a spoliation inference.

Because the comparator evidence is insufficient to establish a prima facie claim, the record does not give rise to an inference of unlawful discrimination. Accordingly, we will affirm the District Court's summary judgment of Davis's discrimination claims.

## B.

We now turn to Davis's individual unlawful retaliation claims.[11] To meet her prima facie burden with respect to these claims, Davis must produce evidence "sufficient

---

[9] *Bull*, 665 F.3d at 73, 79.

[10] *Id.* at 79 (citation omitted).

[11] Individually, Davis brings unlawful retaliation claims under Section 1981 and Section 1983. Individually and on behalf of E.D., Davis brings unlawful retaliation claims under Title VI and the PHRA.

to raise the inference that her engagement in a protected activity was the *likely reason*" for the adverse action.[12] She "may rely on 'a broad array of evidence' to demonstrate the causal link between [the] protected activity and the adverse action taken."[13] Davis argues that the temporal period, beginning in January 2012 when she escalated her complaints, and spanning until February 1, when Lindemann began keeping detailed notes of E.D.'s conduct in the reflection journal, and on March 1, when Lindemann began removing E.D. from the classroom, establishes the requisite causal link. We disagree.[14]

The record as a whole does not give rise to the requisite inference of causation. "The element of causation, which necessarily involves an inquiry into the motives of [the defendant], is highly context-specific."[15] Lindemann kept notes of E.D.'s conduct before January 2012. He began keeping more detailed notes on February 1, the day after Davis made clear that she would no longer speak to him about E.D. Not only was Lindemann's detailed note keeping consistent with his need to communicate with Davis about her son

---

[12] *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 253 (3d Cir. 2017). Although *Carvalho-Grevious* is a Title VII and Section 1981 case, we have treated similarly equal protection claims brought under Section 1983, *Stewart v. Rutgers, the State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997), Title VI claims, *Pryor*, 288 F.3d at 569, and PHRA claims, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997). *See e.g.*, *Estate of Olivia ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010); *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003).

[13] *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007).

[14] *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759-60 (3d Cir. 2004) (holding that on its own, an intervening temporal period of two months cannot raise an inference of causation).

[15] *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).

through a third party, but also, it began before Davis took affirmative steps towards litigation, and before she filed a PHRC complaint.

The causal link is also lacking with respect to E.D.'s removal. The RTII plan was specifically tailored to E.D.'s escalating behavioral issues and included removal as a last-resort when E.D.'s oppositional behavior escalated in response to redirection, or when E.D. engaged in disruptive attention seeking behavior. After the plan was instituted, the Defendants removed E.D. to the hallway infrequently and for limited periods of time. They first removed E.D. to the work-away room more than two months after Davis escalated her complaints. Although the RTII plan was proposed after Davis threatened litigation, there is no evidence linking Davis's threats to the Defendants' treatment of E.D, and on its own, communicating concerns about ongoing antagonism is not probative of retaliatory animus.[16]

In the absence of direct or comparator evidence, a reasonable factfinder could not conclude that the challenged scrutiny or discipline was in any way related to Davis's protected activities. Accordingly, we will affirm the District Court's order entering summary judgment of Davis's retaliation claims.

---

[16] *See e.g. Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005) (concluding that the temporal period coupled with the defendant's concession that the plaintiff's protected activity "'irritated' him and caused him to view [the plaintiff] as suspect," supported an inference that the defendant denied the plaintiff's grievance in retaliation for his protected activity).

IV.

For the reasons set forth above, we will affirm the order of the District Court.