**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1398
_____

THOMAS K. VAUGHAN, JR.,
                                             Appellant

v.

THE BOEING COMPANY

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. Action No. 2-15-cv-04845)
District Judge: Honorable Gerald A. McHugh
_____

Submitted Under Third Circuit LAR 34.1(a)
December 15, 2017
_____

Before: CHAGARES, RESTREPO, FISHER *Circuit Judges*.

(Filed: May 22, 2018)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

RESTREPO, *Circuit Judge*.

Plaintiff-Appellant Thomas Vaughan, Jr. appeals from an order of the District Court granting summary judgment to his former employer, The Boeing Company, on his federal and state law claims of race discrimination and retaliation. We will affirm.

**I[1]**

As the District Court aptly remarked, this case presents an unfortunate situation: the falling out between a long-time employee and his employer. In 2013, after eighteen years of working at Boeing, Vaughan was fired from his position as a composite fabricator due to an altercation with a shift manager. However, Vaughan was able to negotiate his return pursuant to a Reinstatement and Last Chance Agreement entered into by Vaughan, his union, and Boeing. The Last Chance Agreement required Vaughan to meet regularly with an Employee Assistance Program ("EAP") counselor, Richard Buxton, who worked on-site at Boeing but was employed by a third-party counseling agency.[2] This agreement also put Vaughan "on notice that any incident, considered to be insubordination, either direct or indirect, [would] result in his immediate discharge." JA 140.

Upon Vaughan's return to Boeing, he was moved from the department where he had worked for the previous six years and the task with which he was familiar—

---

[1]  Because we write solely for the benefit of the parties, we recite only the facts necessary to this opinion.

[2]  The conversations between employees and any third-party EAP counselors are confidential, and counselors may only break that confidentiality in extreme circumstances or if given permission by the employee.

"deflash," or the grinding down of airplane parts to ensure smoothness. Instead, Vaughan was assigned to a new task in a new department with a new supervisor. Specifically, Vaughan was assigned to perform "bonding," or attaching component parts to aircrafts, in the V-22 Osprey Department ("V-22 Department") under the direction of Charles Moyer, a white supervisor. Out of approximately twenty to twenty-five employees, Vaughan was the only black composite fabricator in Moyer's bonding operation in the V-22 Department.

Initially, Vaughan was tasked with sweeping the floor, rather than with substantive bonding work. After several weeks of being constrained to sweeping work, Vaughan expressed his frustration to Moyer. Vaughan also conveyed his concern to Buxton that he was spending an unusual amount of time sweeping and still had not been given substantive work. Vaughan gave Buxton permission to relay this concern to the employee relations department, which Buxton did. Within a week of Buxton's notice to employee relations, Vaughan was finally given "meaningful work[.]" JA 147.

Once performing his primary task in bonding—attaching fuel bag hangers to airplane fuel tanks—Vaughan felt that he was not receiving enough hands-on training, and he relayed this concern to Buxton. Vaughan also expressed this training concern to Moyer on several occasions. On one such occasion, Moyer responded to Vaughan's request for training by asking "if [he] was an idiot." JA 90. Vaughan notified Buxton of Moyer's unprofessional and unfortunate insult, who in turn relayed the comment to Vaughan's union. In response, Boeing transferred Vaughan the next day to a different supervisor in the same V-22 Department, Mark Muldowney, who was white. Following

3

this transfer, Vaughan reported to Buxton that he was "more optimistic" in the new arrangement, now that he was performing substantive work. JA 147.

At the same time, Vaughan consistently experienced difficulty following Boeing's safety protocol regarding Foreign Object Debris ("FOD"), or items foreign to the aircraft under construction. To prevent stray tools in particular from being left behind in a worksite, Boeing employs a "chit" system in order to regulate the checking out of tools from any toolbox. Under this system, employees must leave a chit—or piece of plastic marked with an employee identification number—in place of a tool while it is in use. Once no longer in use, employees must return the tool to the box and retrieve the placeholder chit. Employees are required to remove all tools and FOD from the worksite every time they leave the worksite, no matter how short the break. At the end of their shifts, employees are required to return all tools to the toolbox and account for all chits. If any tool or chit is missing, employees are required to notify a manager, and the factory is shut down until the tool or chit is located. Because of the seriousness of the FOD safety protocol, all composite fabricators are required to undergo an annual FOD training. Vaughan had taken the annual FOD training.

Shortly after beginning substantive work, Muldowney noticed that Vaughan left FOD on an aircraft while on break. Because Vaughan was new to the V-22 Department and stated he was "unaware of the processes" in that operation, Muldowney briefed Vaughan about the issue and provided an informal coaching session on FOD control. JA 334. Muldowney informed Vaughan that, pursuant to Boeing's discipline policy, future

4

violations could result in corrective action, which typically entailed the involvement of human resources ("HR") and the issuance of a written warning.

One week later, Vaughan left out several tools on a cart overnight and Muldowney emailed the HR representative for the V-22 Department about both this infraction and the previous incident. Because it was not Vaughan's first infraction, Muldowney requested that HR issue Vaughan a written warning. Shortly thereafter, while an HR investigation and decision on the overnight FOD incident was pending, Muldowney observed that Vaughan left paper backing on an aircraft. Two days later, Vaughan checked out a sander from a toolbox without placing a chit in its place. Vaughan was ultimately given a written warning and a three-day suspension in light of his four FOD infractions.

Following his suspension and return to work, Vaughan worked overtime without prior approval. Earlier on the same day of this violation, Muldowney had discussed the overtime workplace policy with his employees, including Vaughan. Muldowney notified HR and requested that Vaughan be disciplined for this infraction. While that decision was pending, Donald Clayton, a black manager from another operation, notified Muldowney that he saw an orbital sander left overnight in a cart in the bonders' work area and that one of Vaughan's chits was in the sander's place. Muldowney reported this final incident to HR, recommending that Vaughan be fired. Vaughan disputes the sixth and final infraction—he maintains that he did not leave the orbital sander out, as stated by Clayton.[3]

---

[3] Because Vaughan disputes that the sixth and final violation took place, the Court construes the facts in Vaughan's favor, as it must at this stage, and considers only his first

5

On January 27, 2014, less than four months after Vaughan's return, Boeing terminated Vaughan citing his unauthorized overtime and FOD infractions. Although Vaughan offers explanations for them, he does not dispute that the first five infractions—four FOD and one overtime—occurred.

Vaughan filed this action against Boeing asserting claims of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; 42 U.S.C. § 1981; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. §§ 951–63. The District Court granted summary judgment in favor of Boeing on all claims. Vaughan timely appeals.

## II

The District Court had jurisdiction pursuant to 28 U.S.C §§ 1331 and 1367, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over a District Court's order granting summary judgment. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 164 (3d Cir. 2013). Therefore, we apply the same standard as the district court. *Id.* Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the facts in the light most favorable to the nonmoving party; do not engage in

---

five infractions. Moreover, to the extent that a jury's consideration of the disputed infraction would not impact the outcome, this dispute is not one of material fact sufficient to preclude summary judgment. *See Hampton v. Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 112 (3d Cir. 1996) ("[T]he non-moving party must demonstrate a dispute over facts that might affect the outcome of the suit."); *Fuentes v. Perskie*, 32 F.3d 759, 766–67 (3d Cir. 1994).

6

credibility determinations; and draw all inferences in the non-movant's favor. *Mandel*, 706 F.3d at 164. If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then there can be no genuine issue of material fact and we will affirm a District Court's grant of summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III

All claims of race discrimination brought under Title VII, § 1981, or the PHRA are governed by the "familiar burden-shifting framework" set forth in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973).[4] *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir. 1999). Under this framework, a plaintiff first "carr[ies] the initial burden . . . of establishing a *prima facie* case of racial discrimination." *McDonnell Douglas*, 411 U.S. at 802; *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). In order to establish a *prima facie* claim of discrimination, "[a] plaintiff must show that: 1) [he] is a member of a protected class, 2) [he] was qualified for the position [he] sought to attain or retain, 3) [he] suffered an adverse employment action, and 4) the action occurred

---

[4] We have previously held that "the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009). The same is true for claims brought pursuant to the PHRA. *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims[.]"). Accordingly, we evaluate Vaughan's several race discrimination claims simultaneously.

7

under circumstances that could give rise to an inference of intentional discrimination." *Mandel*, 706 F.3d at 169 (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).

If a plaintiff is able to set out a *prima facie* case of discrimination, the burden then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. Finally, if the employer articulates such a reason, the burden shifts back to the plaintiff to show that the employer's "stated reason . . . was in fact pretext." *Id.* at 804.

A plaintiff can defeat summary judgment by demonstrating pretext in one of two ways: 1) by "point[ing] to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material fact as to the credibility of that reason[,]" *Burton v. Teleflex Inc.*, 707 F.3d 417, 430–31 (3d Cir. 2013) (citing *Fuentes*, 32 F.3d at 762), or 2) "pointing to evidence that indicates that the employer acted with discriminatory animus[,]" *id.* If proceeding by the first method, a plaintiff need not provide evidence that the employer acted with animus, but rather only that the employer's rationale is "unworthy of credence[.]" *Id.* (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)).

To establish a *prima facie* claim of retaliation, a plaintiff must show that "(1) [he] engaged in activity protected by Title VII; (2) the employer took adverse employment action against [him], and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340 (3d Cir. 2006). "[A]t the prima facie stage, a plaintiff need only proffer

8

evidence sufficient to raise the inference that [his] engagement in a protected activity was the *likely reason* for the adverse employment action[.]" *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 253 (3d Cir. 2017) (emphasis in original).

**IV**

**A**

Boeing does not dispute that Vaughan has met the first three elements of a *prima facie* case of race discrimination. Therefore, the only question remaining for Vaughan to establish a *prima facie* claim is whether the circumstances surrounding his termination give rise to an inference of race discrimination. The District Court reasonably found the question a close one, and ultimately decided Vaughan narrowly made a showing supporting a discriminatory inference. But, even if we presume Vaughan has made such a showing and has, therefore, stated a *prima facie* case of race discrimination, Vaughan's claim would nonetheless fail at the third step of the *McDonnell Douglas* framework: pretext.

At the first step, we assume *arguendo* that Vaughan has set forth a *prima facie* claim. At the second step of the *McDonnell Douglas* framework, Boeing has articulated a legitimate, non-discriminatory rationale for Vaughan's termination: Vaughan's many FOD infractions and his overtime violation. At the third step, Vaughan has not overcome that rationale by pointing to evidence that would either undermine the credibility of Boeing's legitimate, non-discriminatory reason for terminating him or suggest that Boeing acted with discriminatory animus. *Burton*, 707 F.3d at 430–31.

9

First, there is no basis to "disbelieve [Boeing's] articulated legitimate reasons[.]" *Fuentes*, 32 F.3d 759, 764 (3d Cir. 1994). Vaughan contends that there is a genuine dispute of material fact on this point because, in his view, Boeing fired him solely because of the final, disputed FOD incident. But Vaughan's FOD infractions were numerous and, with the exception of one, undisputed by Vaughan. The corrective action memorandum recommending termination recognizes this, noting that Vaughan "ha[d] been provided numerous coaching sessions and trainings for similar [FOD] incidents[.]" JA 259. Moreover, the termination memo cites to Vaughan's "work[ing] unauthorized post-shift overtime despite verbal instructions not to do so[.]" *Id.* Unfortunately for Vaughan, he was on tenuous ground at the time of this infraction. Acting contrary to Muldowney's overtime instructions on the same day they were given could be construed as "insubordination, either direct or indirect" sufficient to trigger immediate discharge under the Last Chance Agreement. JA 140. This undisputed evidence regarding the overtime violation precludes us from finding Boeing's stated reason for Vaughn's termination unworthy of credence.

Second, Vaughan has not "point[ed] to evidence that indicates that the employer acted with discriminatory animus." *Burton*, 707 F.3d at 430–31. Vaughan offers as comparators the names of white employees who he posits had violated FOD and overtime requirements without repercussions. But even accepting, as we must at summary judgment, Vaughan's testimony that some of his white co-workers were committing FODs or performing unauthorized overtime without repercussions, neither Vaughan's testimony nor the balance of the evidence suggests that those employees were similarly-

10

situated and therefore proper comparators. For example, he has not shown that each of the identified white employees committed multiple violations with impunity. Moreover, Vaughan was an employee on a "Last Chance." Vaughan has not indicated whether the other white bonding employees were on similar probationary status. Thus, Vaughan has not provided adequate comparator evidence. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) ("The plaintiff has the burden of demonstrating that similarly situated persons were treated differently." (citing *Burdine*, 450 U.S. at 258)).

Because Vaughan has not provided reason to disbelieve Boeing or find racially discriminatory animus in his termination, he has failed to meet his burden to show pretext under *McDonnell Douglas.*

**B**

Finally, Vaughan has failed to state a *prima facie* claim of retaliation. For the purposes of this motion, the parties agree that Vaughan engaged in protected activity. We accept, as we must at summary judgment, Vaughan's contention that the protected activity at issue is his communication to Buxton that he believed he was being treated unfairly because of his race. The parties also agree that he suffered adverse employment action. Therefore, only the third element is in dispute—that a causal connection existed between the first and second elements.

The Court agrees with the District Court that Vaughan has failed to establish such a causal connection. In order "for protected conduct to be a . . . factor in a decision, the decisionmakers must be aware of the protected conduct." *See Ambrose v. Township of*

11

*Robinson*, 303 F.3d 488, 493 (3d Cir. 2002). Without such awareness, the causal chain is broken.

Vaughan has presented evidence that Buxton communicated Vaughan's concern that he "was spending an unusual amount of time sweeping the floor" to Boeing's employee relations department. JA 147. But Vaughan has not presented any evidence that Boeing was made aware or had knowledge of the component of Vaughan's communication which would be protected—that race discrimination may be at the root of his sweeping concern. Though Buxton testified that he privately believed Vaughan may have been tasked to sweep for so long due to discrimination, Buxton also testified that he kept that belief private from both Vaughan and from Boeing. Buxton further testified that, because his communications with Vaughan were confidential, he only conveyed to Boeing the portion of their conversation that Vaughan permitted Buxton to relay—that Vaughan was given "excessive[]" sweeping duties and was concerned that he had not performed substantive work since his return to Boeing. *Id.* Buxton did not frame Vaughan's sweeping concern as one of race discrimination when conveying it to Boeing.

Vaughan does not dispute Buxton's testimony, but instead argues that this Court should nonetheless make the inference that the employee relations department, Muldowney, and other supervisors nonetheless knew of the discriminatory nature of Vaughan's complaint. But, as the District Court reasonably noted, this request goes too far. At summary judgment, we must view the facts in the light most favorable to Vaughan *only* to the extent that there is a genuine dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Similarly, we must only draw all *reasonable* inferences in

12

Vaughan's favor "to the extent supportable by the record." *Id.* at 381 n.8. To assume that Boeing knew Vaughan engaged in protected activity where the record suggests otherwise would be an unreasonable inference that we cannot make. Vaughan has, therefore, failed to show his protected activity was a factor in Boeing's decision. Without a showing of causation, Vaughan has failed to establish a *prima facie* claim of retaliation.

**V**

For the foregoing reasons, we will affirm the judgment of the District Court.